## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

2003 OCT 16  P 2: 29

---

JOHN K. DWIGHT, et al.,      )
                )
      Plaintiffs,      )
                )
v.                ) CIVIL ACTION NO. 303CV 0117 (WWE)
                )
JP MORGAN CHASE BANK,      )
TRUSTEE, et al.,          )
                )
      Defendants.     ) OCTOBER 15, 2003
                )

---

STATE OF CONNECTICUT )
               )
               )  ss:    Westport
               )
COUNTY OF FAIRFIELD   )

### AFFIDAVIT OF MARK J. KOVACK

Mark J. Kovack, being duly sworn, does depose and state:

1.    I am a member of the law firm of Wake, See, Dimes & Bryniczka, counsel for this defendant, JP MORGAN CHASE BANK, TRUSTEE ("Chase"), in the above-captioned matter. I am over 18 years of age and believe in the obligations of an oath.  I submit this affidavit, based on my own personal knowledge, to identify certain documents submitted as exhibits in support of the Local Rule 56(a)(2) Statement By Defendant JP Morgan Chase Bank, Trustee, of even date herewith.

2.    Attached hereto as Exhibit No. 1 are excerpts from the deposition of Lucy Roberts, the daughter of defendant PATRICIA W. DWIGHT ("Mrs. Dwight"), conducted in this action on

-1-

July 1, 2003.

    3.     Attached as Exhibit No. 2 are excerpts from the deposition of Mrs. Dwight, conducted in this action on June 24, 2003.

    4.     Attached as Exhibit No. 3 are excerpts from the deposition of Sheela Amembal, a Chase Trust Officer and the individual employee primarily handling the Trust account as issue at most times relevant to this matter, conducted in this action on May 15, 2003.

                             Mark J. Kovack

Sworn and subscribed to before me this 15th day of October, 2003.

                             Notary Public/Commissioner
                             of the Superior Court

1        UNITED STATES DISTRICT COURT
2             DISTRICT OF CONNECTICUT

3    JOHN K. DWIGHT, MARGO D. FORBES,          CIVIL ACTION NO.
     PATRICIA D. HALLENBECK AND                303CV0117 (WWE)
4    ELIZABETH D. RICHARDSON

5    VS.

6    JP MORGAN CHASE BANK, Trustee             JULY 1, 2003
     of the Russell S. Dwight, Jr.
7    Trust, and PATRICIA W. DWIGHT

8                                              COPY

9

10        Deposition of **LUCY ROBERTS**, taken in

11   accordance with the Federal Rules of Civil Procedure

12   at the law offices of Wake, See, Dimes & Bryniczka,

13   27 Imperial Avenue, Westport, Connecticut, before

14   Peggy McKie, Notary Public in and for the State of

15   Connecticut, on Tuesday, July 1, 2003, commencing at

16   9:03 a.m.

17

18

19

20             Peggy McKie, License No. 00175
                Registered Professional Reporter
21

22          DEL VECCHIO REPORTING SERVICES, LLC
             PROFESSIONAL SHORTHAND REPORTERS
23

24   117 RANDI DRIVE              100 PEARL STREET, 14th FLOOR
     MADISON, CT  06443           HARTFORD, CT  06103-4506
25   (203) 245-9583               (800) 839-6867

1      A.    Yes.

2      Q.    I didn't hear a response.

3      A.    Yes.

4      Q.    All right.  Had it happened more remotely

5   than five years ago?

6      A.    I don't remember.

7      Q.    What occasions do you remember?  And I

8   understand, and you should understand, that I'm not

9   asking you to give me precise dates, I'm just asking

10  you to give me whatever frame of reference helps you

11  orient yourself to those occasions when your mother

12  needed the assistance of someone living with her in the

13  house.  Either you can refer to it as when she had this

14  operation or that operation or --

15     A.    She's had multiple hospitalizations within

16  the last couple of years, the last year and a half

17  being the worst.

18     Q.    All right.  And prior to that, had there

19  been some occasions as well?

20     A.    Yes.

21     Q.    And on the occasions of these

22  hospitalizations, someone had stayed with her during

23  her convalescence; is that what I should understand?

24     A.    Yes.

25     Q.    Do you have a sense of how long these

1      A.      That's a very broad question.

2      Q.      It's intended to be.

3      A.      She has a lot of medical problems.  Could I

4    name them?  No.

5      Q.      Well, could you describe how they affect

6    her?

7      A.      She's very weak.  She has difficulty

8    getting around.

9      Q.      Are these conditions that you are

10   describing what you consider to be progressive as --

11     A.      Definitely.

12             I'm sorry, would you repeat the question?

13     Q.      As you observed and spent time with your

14   mother over the course of the last ten years, do you

15   understand these conditions to be progressive as

16   opposed to matters of an acute onset?

17     A.      Unfortunately, they have been progressive

18   over the last couple of years.

19     Q.      Has the level of care that your mother has

20   been receiving changed over the last year and a half to

21   two years?

22     A.      Dramatically.

23     Q.      Can you describe to me the changes in the

24   level of care?  And by that, what I am asking you is

25   care provided by outside providers.

1          A.    She has some problems with her vision.

2          Q.    Yes.

3          A.    Very serious problems, which she's also

4    been seeing a doctor for.  She has lost her ability to

5    drive.  She has lost her ability to read the way she

6    used to love to read.  She now has to sit under a huge

7    magnifying light and magnifier.  She's very unsteady on

8    her legs, so she can no longer go for walks, which she

9    used to love to do.  She has to be driven everywhere.

10   She's lost her independence.

11         Q.    But what I'm trying to determine is whether

12   the number or extent of employees or others assisting

13   her has changed in the last several years.

14         A.    Yes, it has.

15         Q.    Can you describe that for me?  In what way

16   has it changed?

17         A.    Because she no longer has the freedom to

18   take care of herself due to her medical problems, we

19   have had to hire people to do most of her -- well, to

20   do all her driving.  If she needs to go to the grocery

21   store, somebody needs to be hired.  She has physical

22   therapy once or twice a week, depending, and she has to

23   be driven to that.  She has to be driven to all her

24   doctors' appointments.  She -- I'm losing track of the

25   question.

```
 1          Q.      No, you're on the right track.  The

 2   question was the extent to which the provision of

 3   services by outsiders has increased, and you've said

 4   now that she needs to be driven to the grocery store

 5   when she has to go, she's driven to physical therapy

 6   once or twice a week, and she's driven to her doctors'

 7   appointments?

 8          A.      Right.  Doctors, dentists, whatever.

 9          Q.      Yes, I understand that.  Anything else that

10   you can think of that reflects a change over the last

11   two years from what it had been?

12          A.      That's a huge change.  Also, when she has

13   these -- she's had multiple hospitalizations, and when

14   she's returned home, she's needed the care given at

15   home.  The physical therapist has to come to the house.

16   The massage therapist, which has been prescribed by her

17   doctor, has to come to the house.

18          Q.      Is there anything else that you can think

19   of?

20          A.      Not right this minute.

21          Q.      All right.  So with respect to driving to

22   the grocery store, do you have any understanding or

23   sense of the frequency with which that occurs?

24          A.      I would imagine once or twice a week.

25          Q.      Who makes the arrangements to secure the
```

```
1              Q.    In addition to the drivers, the providers

2    that you are aware of are the physical therapists; is

3    that right?

4              A.    Well --

5              Q.    The ones who have come to the home.

6              A.    She needs somebody to pay her bills, and

7    that woman comes to the home.  She needs somebody to

8    help with her cleaning once a week.  That woman comes

9    to the home.

10             Q.    All right.  Anybody else?

11             A.    When she goes through these difficult

12   periods, often a nurse will come by to check her vital

13   signs.  It varies.

14             Q.    All right.  Let's talk about these one by

15   one.  The person who pays the bills, do you know who

16   that person is?

17             A.    Yes, I do.

18             Q.    Who is that person?

19             A.    Lesley Cowenhoven.

20             Q.    At some point you'll spell that for the

21   court reporter.

22                   This woman, Lesley, is that someone who has

23   been helping your mother for some time?

24             A.    I'm not exactly sure when she started.

25             Q.    Has your mother needed help paying bills
```

DEL VECCHIO REPORTING SERVICES, LLC

1    for some time?

2         A.    Yes.

3         Q.    Can you ballpark the number of years that

4    you have been aware that somebody has helped?

5         A.    My mother's a very proud woman, so she did

6    it on her own for as long as she could.

7         Q.    And I understand that, and I'm not

8    suggesting that she's anything but a very proud woman,

9    I just am trying to get an answer to my question, which

10    is --

11         A.    I don't know.

12         Q.    -- over the last number of years, five

13    years?

14         A.    I don't know.

15         Q.    In that event, you don't know that this is

16    a recent --

17         A.    I'm sorry, I couldn't hear.

18         Q.    In that event, you are not able to say that

19    this need for a bookkeeper or someone helping to pay

20    the bills is a recent occurrence; correct?

21              MR. KOVACK:  I'm going to object to

22              the form.

23         A.    And I'm not sure what you mean by "recent."

24    BY MR. HEMLEY:

25         Q.    Within the last couple of years.

```
 1              MS. ALLISON:  Okay.

 2              MR. HEMLEY:  Thanks.

 3              (Recess.)

 4              MS. ALLISON:  Bob, during the break,

 5         Mrs. Roberts remembered some additional

 6         medical conditions of her mother, so she'd

 7         like to fill in the record with explaining

 8         those.

 9      A.    She went to the hospital about three weeks

10   ago for an EMB and an MRI on an outpatient basis.  And

11   the neurologist, Dr. Levine, called her and said

12   something about dangerously high diabetes.  And I'm

13   taking my mother today to the doctor to have those test

14   results read.

15   BY MR. HEMLEY:

16      Q.    Okay.  This was, as I believe I heard it,

17   within the last several weeks?

18      A.    Yes.

19      Q.    Had she been diagnosed with diabetes, to

20   your knowledge, before that?

21      A.    They've been watching it, watching her

22   blood levels.

23      Q.    But she hadn't received a diagnosis of

24   diabetes before that you are aware of?

25      A.    I think it was borderline.
```

DEL VECCHIO REPORTING SERVICES, LLC

1   Q. Did your mother say anything to you about

2 why she was asking to have the budget prepared?

3   A. I don't remember.  I just assumed it was

4 for this lawsuit.

5   Q. This Lesley Cowenhaven (sic), or

6 Cowenhoven, is she a neighbor of your mother's?

7   A. No, she is not.

8   Q. Is she in the business, as you know it, of

9 assisting people with their books?

10   A. Yes, she is.

11   Q. Do you know where her office or place of

12 business is located?

13   A. She does it out of her home.

14   Q. And where is that?

15   A. In Weston, Connecticut.

16   Q. I'm sorry?

17   A. Weston, Connecticut.

18   Q. Do you know how long she has assisted your

19 mother with bookkeeping or check writing, things of

20 that sort?

21   A. I think it started when my mother's

22 eyesight was so bad that she couldn't do it on her own

23 anymore.

24   Q. Do you have any sense of when that was in

25 terms of years, whether it was in the last year,

1    several years, five years, or more?

2          A.    I'd say within the last two or three years.

3    I don't really know the date.

4          Q.    All right.  Has your mother ever -- strike

5    that.

6                I'm going to ask you about another exhibit,

7    which Mr. Kovack can provide to you, if he would.  It's

8    No. 5.  It's a letter dated August 29, 2002.

9                     MR. KOVACK:  I'm handing it to the

10                   witness.

11                   MR. HEMLEY:  Thank you.

12   BY MR. HEMLEY:

13         Q.    And if we're on the same page, it's a

14   letter that your mother signed addressed to Sheila

15   Amenbal?

16         A.    Yes.

17         Q.    Is that what you have?

18         A.    Yes.

19         Q.    This letter states, as you can see, that

20   she is requesting the distribution of income from the

21   Russell Dwight Trust to her, and she indicates that

22   medical problems referred to in the letter have

23   resulted in substantial medical expenses.  Do you see

24   that in the last line of the first paragraph?

25         A.    Yes.

1    Q.    Do you know the dimension of the medical

2    expenses that were occasioned by the items that are

3    recited in this letter?

4    A.    No, I do not.

5    Q.    Do you know if they are reflected on the

6    budget?

7    A.    I'm assuming they are, but I do not know.

8    I did not prepare this budget.

9    Q.    All right.  Do you know if the events that

10   she is describing on August 29, 2002, or any of them

11   occurred during the year 2002?

12   A.    That makes sense.  I'd forgotten about the

13   Lyme disease, that was very strange, um --

14   Q.    So your understanding is --

15              MS. ALLISON:  Excuse me, can you let

16              the witness finish her answer, please?

17              MR. HEMLEY:  The witness may certainly

18              finish her answer, and I'm sure you'll

19              understand I'm not in a position to see

20              whether or not she is finished.  So when

21              she stopped talking, I thought she had

22              been.

23   BY MR. HEMLEY:

24   Q.    But go ahead.  By all means, finish your

25   answer.

DEL VECCHIO REPORTING SERVICES, LLC

1    A.    Yes, I'd forgotten about the Lyme disease,

2    and yes, that all fits.  She had the couple of -- as I

3    said, I thought she had like three or four stays in the

4    hospital that year.  And again, that was the year my

5    daughter got married, my oldest daughter got married.

6    Q.    And that year is, so the record is clear,

7    2002?

8    A.    Yes.

9    Q.    In the second paragraph of the letter,

10    Exhibit No. 5, your mother states, "For health reasons,

11    I have decided to hire a live-in companion."

12        Do I understand correctly from her

13    testimony that she never has hired a live-in companion?

14    A.    Yes and no.  After her hospitalizations, we

15    had to have somebody at the house.  And we have had, as

16    a family, mainly between my siblings, a lot of

17    discussion on the fact that mother needs, for safety

18    reasons and health reasons, to have somebody living

19    with her.

20    Q.    So the first part of your answer refers to

21    the matters that we have already discussed; that is to

22    say, the times when someone has actually stayed at the

23    house?

24    A.    Yes.

25    Q.    You don't mean to be introducing some other

1    subject by your response?

2        A.    I thought I was just answering the

3    question.

4        Q.    No, no, no, I'm not criticizing you, I just

5    want to make sure that we are not going down a new road

6    that I should pursue.

7            When you said that there have been times

8    that she has had to have someone with her, those are

9    the times we have already discussed?

10        A.    Yes.

11        Q.    All right.

12        A.    Yes, but the point is that she really needs

13    somebody there on an ongoing basis, not just when

14    there's a medical crisis.

15        Q.    I understand that may be your point of

16    view, and I'm not in a position to agree or disagree

17    with it, I'm just trying to make sense of this

18    representation in the letter which states, "I have

19    decided to hire a live-in companion."

20            And I want to be clear that as of this date

21    now when we're in the 1st day of July of 2003, other

22    than the occasions which we've already discussed, she

23    has not hired a live-in companion to be with her on a

24    regular basis; correct?

25        A.    That is correct.

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2    --------------------------------x
      JOHN K. DWIGHT, MARGO D.
 3    FORBES, PATRICIA D. HALLENBECK
      and ELIZABETH D. RICHARDSON,
 4
                   Plaintiffs,
 5
      vs.                    Case No. CV303CV0117(WWE)
 6                           Date:  June 24, 2003
      J. P. MORGAN CHASE BANK,
 7    TRUSTEE OF THE RUSSELL S.
      DWIGHT, JR., TRUST, and
 8    PATRICIA W. DWIGHT,
 9                   Defendants.
      --------------------------------x
10
                DEPOSITION OF PATRICIA DWIGHT
11
          The deposition of Patricia Dwight was taken
12    on June 24, 2003 at the offices of Cummings &
      Lockwood, Stamford, Connecticut before Susan
13    Wandzilak, Registered Professional Reporter and
      Notary Public in the State of Connecticut.
14
      A P P E A R A N C E S
15
      ROBERT B. HEMLEY, ESQUIRE
16          Gravel and Shea
            76 St. Paul Street
17          Burlington, Vermont 05402
               Attorney for Plaintiff
18
      ROBERT DOLIAN, ESQUIRE
19          Cummings & Lockwood, LLC
            Four Stamford Plaza, 107 Elm Street
20          Stamford, Connecticut 06902
               Attorney for Defendant Patricia Dwight
21
      MARK J. KOVACK, ESQUIRE
22          Wake, See, Dimes & Bryniczka
            27 Imperial Avenue
23          Westport, Connecticut 06880
               Attorney for Defendant Chase
24
                     Susan Wandzilak
25                   (203)965-5238
```

1    or for any other reason or did he pay those

2    expenses himself?

3         A.    No, I paid from our joint account.

4         Q.    And, how was the joint account funded,

5    if you recall?

6         A.    By Russell Dwight.

7         Q.    And, what were the kinds of items that

8    the joint account was used to pay?

9         A.    Food and the regular household bills,

10   electric, gas.

11        Q.    And, then your own account was used for

12   whatever discretionary purchases or gifts you

13   wanted to make?

14        A.    And I also had my condo in Southport.

15        Q.    Which you financed yourself?

16        A.    Yes, completely.

17        Q.    And, that is the location where you

18   presently reside; correct?

19        A.    Correct.

20        Q.    Was Russell Dwight aware that you were

21   receiving money from the John Wineberg trust

22   during the course of your marriage to him?

23        A.    Of course.

24        Q.    During the time that you were married to

25   Russell Dwight, did any of your children or his

1     Q.   What did you understand was the purpose

2   of the Russell Dwight trust insofar as you were

3   concerned?

4     A.   I didn't even think about it.

5     Q.   There had been a number of years since

6   the trust was created when you affirmatively told

7   the trustee that you did not want to receive any

8   money; is that correct?

9     A.   Yes.

10     Q.   And, why was that?

11     A.   Because the Dwight children had children

12   in college and they had expenses and I at that

13   point didn't have the illnesses and problems I

14   have now and I didn't have the expenses.

15     Q.   During the last year, Mrs. Dwight, have

16   you taken any trips?

17     A.   No.

18     Q.   Have you been to Europe in the last 12

19   months?

20     A.   No.

21     Q.   When was the last time that you took a

22   trip?

23     A.   Several years ago.  I haven't been

24   strong enough to go away.

25     Q.   Do you recall that you wrote to the

1    trustee and informed them that you needed to

2    receive income from the Russell Dwight trust in

3    the fall of 2002?  Do you recall that?

4         A.    No.

5         Q.    Do you recall that you wrote a letter to

6    the trustee at any time saying you needed the

7    money?

8         A.    No, I can't recall.

9         Q.    Do you recall ever coming to the

10   conclusion that you needed the money?

11        A.    Definitely.

12        Q.    And, when was that?

13        A.    I can't tell you.

14        Q.    Why did you believe that you needed the

15   money?

16        A.    Because my expenses were more than my

17   income.

18        Q.    Do you have other resources beyond the

19   Russell Dwight trust that provide you with

20   income?

21        A.    I have my father's trust and my own

22   money.

23        Q.    Have you from time to time made

24   decisions to sell assets in order to -- we will

25   leave it at that.  Have you made decisions from

1    time to time to sell assets, stocks and bonds?

2          A.    I did last year in order to get a more

3    steady income after the crash.

4          Q.    Now, I have been through the tax returns

5    that have been made available to me by your

6    lawyers as part of the discovery in this case and

7    I can represent to you that you have received

8    capital gains without exception from 1995 through

9    2002; is that consistent with your memory?

10         A.    I don't think I sold anything until last

11   year.

12         Q.    Okay; well, your tax returns -- and I

13   will represent this to you -- show that you had

14   gains of $23,000 -- these are in round numbers --

15   in 1995, $60,000 in 1996, $66,000 in 1997,

16   $36,000 in 1998, a capital loss of $3,000 in 1999

17   and then gains of $73,000 in 2000, $7,000 in

18   2001, and $382,000 in 2002.  Other than the sales

19   that you made in 2002 to produce the gains, do

20   you have any recollection of the gains that I

21   have just recited as appearing on your tax

22   returns in the prior years?

23         A.    No.

24         Q.    Do you have any recollection of having

25   used the monies generated from the sale of

1      Q.   In this letter, you have indicated that

2    -- and, I am going to just read it to you.  Your

3    lawyers can correct me if I misread it, which I

4    won't.  Quote, for health reasons, I have decided

5    to hire a live in companion, closed quote.  Did

6    you ever hire a live in companion?

7      A.   I haven't been able to afford it.

8      Q.   And, why do you say you haven't been

9    able to afford it?

10     A.   I just can't.

11     Q.   How much would one cost?

12     A.   Oh, a lot.  You have to pay for health

13   insurance plus a good salary.

14     Q.   Have you investigated the cost of a live

15   in companion?

16     A.   Yes.  My sister has one so I have all

17   her figures.

18     Q.   Can you tell me what the cost is?

19     A.   No, I don't recall.

20     Q.   You have over three million dollars in

21   the Prudential account; correct?

22     A.   I don't go into principal.

23     Q.   Well, you don't believe in going into

24   principal; is that what you said?

25     A.   Yes.

1    take care of yourself?

2         A.   At times, I have had nurses.

3         Q.   Just in times of specific need?

4         A.   Yes.

5         Q.   I am going to ask you another question.

6    You have told me that the drivers have been with

7    you for a year or two; right?

8         A.   Right.

9         Q.   So, do I then understand that in August

10   of 2002, there really wasn't any change in your

11   circumstances?

12        A.   There was a great deal of change in my

13   health and my ability to do certain things.

14        Q.   But, you didn't engage any additional

15   people in August of 2002 to assist you?

16        A.   Yes, I did have nurses after I came from

17   the hospital.  I was in the hospital three times

18   in a year.

19        Q.   In 2002?

20        A.   And in a nursing home.

21        Q.   Now, the nurses that you engaged, were

22   those nurses paid for through Medicaid or any

23   other form of insurance?

24        A.   No.

25        Q.   You paid for that all out of your own

1    pocket?

2          A.    Yes.

3          Q.    That was before August of 2002?

4          A.    Yes.

5          Q.    Since August of 2002, have you engaged

6    any nurses?

7          A.    Yes.

8          Q.    When was that?

9          A.    January of 2003.

10         Q.    And, for how long were those nurses

11   required?

12         A.    I don't recall.

13         Q.    Do you know if it lasted weeks or months

14   or whether it was less than that?

15         A.    Months.

16         Q.    A month, okay.

17             MR. DOLIAN:  She said months, plural, I

18         believe.

19             MR. HEMLEY:  I am sorry, I didn't hear

20         you say months, with an S.

21   BY MR. HEMLEY:

22         Q.    Do you know how many months their

23   services were required?

24         A.    No, I don't.

25         Q.    Did you pay for those nurses out of your

1    own checkbook?

2         A.    Yes.

3         Q.    Are the nurses still with you?

4         A.    No.

5         Q.    When did they leave?

6         A.    I don't recall.

7         Q.    Other than the nurses, have there been

8    any increase in medical expenses into August of

9    2002?

10        A.    I can't tell you.  I am so tired now.

11             MR. DOLIAN:  The witness has indicated

12        she is getting very tired, Bob.

13             MR. HEMLEY:  All right.

14             MR. DOLIAN:  Can you finish up, do you

15        think?

16             MR. HEMLEY:  Give me a minute, Bob, and

17        I will see if I can determine along those

18        lines to finish up very quickly.  Would you

19        just give me about a three minute break

20        here.  I am going to put you on mute.

21             (Whereupon, a brief recess was taken.)

22             MR. HEMLEY:  I guess we are going to

23        declare this over.  I don't want to put

24        Mrs. Dwight and in particular John Dwight,

25        who is very concerned about her health, does

1

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT

2
------------------------------------x
JOHN K. DWIGHT, MARGO D.

3
FORBES, PATRICIA D. HALLENBECK
and ELIZABETH D. RICHARDSON,

4
                        Plaintiffs,

5
vs.                          Case No. CV303CV0117(WWE)

6
                             Date: May 15, 2003
J. P. MORGAN CHASE BANK,

7
TRUSTEE OF THE RUSSELL S.
DWIGHT, JR., TRUST, and

8
PATRICIA W. DWIGHT,

9
                        Defendants.
------------------------------------x

10
                    DEPOSITION OF SHEELA AMEMBAL

11
        The deposition of Sheela Amembal was taken on

12
May 15, 2003 at the offices of Wake, See, Dimes &
Bryniczka in Westport, Connecticut before Susan

13
Wandzilak, Registered Professional Reporter and
Notary Public in the State of Connecticut.

14
A P P E A R A N C E S

15
ROBERT B. HEMLEY, ESQUIRE

16
        Gravel and Shea
        76 St. Paul Street

17
        Burlington, Vermont 05402
                        Attorney for Plaintiff

18
KAREN L. ALLISON, ESQUIRE

19
        Cummings & Lockwood, LLC
        Four Stamford Plaza, 107 Elm Street

20
        Stamford, Connecticut 06902
                        Attorney for Defendant

21
MARK J. KOVACK, ESQUIRE

22
        Wake, See, Dimes & Bryniczka
        27 Imperial Avenue

23
        Westport, Connecticut 06880
                        Attorney for Defendant Chase

24
                    Susan Wandzilak

25
                    (203)965-5238

```
1              MR. KOVACK:  Objection.

2              THE WITNESS:  Well, if the instrument is

3         clear, you could consult with your superior

4         or if there were questions that you weren't

5         sure how it should be interpreted, you would

6         go to the counsel and --

7         Q.    Counsel?

8         A.    Yes.

9         Q.    Is that the discretionary?

10        A.    No, the attorney who wrote the

11   instrument.

12        Q.    Counsel.

13        A.    And then the discretionary action

14   committee would really be the ones to make the

15   decision once you present all the facts to them.

16        Q.    Now, in this case, the case of Russell

17   Dwight's trust, I gather at some point you

18   contacted the draftsman of the Russell Dwight

19   trust?

20        A.    I did.

21        Q.    And, I am assuming you did that sometime

22   in the second half of 2002?

23        A.    No, it was actually after I received the

24   request for income for Patricia Dwight that I

25   consulted.
```

1          her if it is before or after.  Otherwise, it

2          is impossible for us to understand the

3          chronology.  I am only asking a yes or no

4          question.

5               MR. KOVACK:  But, the question consists,

6          because it is a leading question, it consists

7          of substantive answer, whether she says yes

8          or whether she says no.

9               MR. HEMLEY:  Okay, well, I disagree with

10          you and I will reserve the right to move to

11          compel that answer.

12     BY MR. HEMLEY:

13          Q.   But, let me ask you in a way that will

14     not result in an instruction to you not to answer

15     the question.  What did you ask Mr. See when you

16     contacted him?

17          A.   The question I was specifically asking

18     Mr. See is under this trust agreement, whether we

19     would have to look at, only at her income, at

20     Patricia Dwight's income, because that's how the

21     instrument was and I wanted to confirm that with

22     him.

23          Q.   As best as you can recall, what was the

24     question you asked him?

25          A.   Do we have to look at her income only

1    and not her assets.

2         Q.   And, what did he say to you?

3         A.   He said yes, for the agreement, you have

4    to look only at her income and not her assets.

5         Q.   Did you have the agreement or the trust

6    agreement in front of you at the time of this

7    conversation?

8         A.   Yes, I did.

9         Q.   Did you meet with Mr. See or did you --

10        A.   No, it was over the phone.

11        Q.   Did you ask him any other questions?

12        A.   I guess just about comparing her current

13   life style to the standard of living from 20

14   years ago.

15        Q.   And, what did you ask about that?

16        A.   Well, how one would go about doing it.

17        Q.   What did he say?

18        A.   He said, well, just, you know, I think I

19   have some information in the file that I might be

20   able to produce to look just at her income from

21   20 years ago.

22        Q.   Why did you think that was an

23   appropriate question to put to Mr. See, how to go

24   about making that comparison?

25        A.   Because he had put the language in the

1    trust agreement.

2         Q.   What questions did you have about that?

3         A.   Of Mr. See or --

4         Q.   Let's look at the trust agreement which

5    has been marked as Exhibit 2 for today's

6    depositions.  And, turning to roman numeral four,

7    number one, you understood that the trustee

8    should pay the income to Patricia Dwight with a

9    caveat being that if and to the extent that the

10   total amount of income available to her from all

11   sources including the trust exceeds that which is

12   deemed necessary for her comfortable support at

13   the standard of living she previously had, and I

14   am obviously paraphrasing, then the income would

15   be distributed to the Dwight children; correct?

16            MR. KOVACK:  Objection.

17            THE WITNESS:  She is the primary

18        beneficiary so she gets the income first and

19        then if there is excess income, you would

20        give it to the Dwight children.

21   BY MR. HEMLEY:

22        Q.   What do you mean if there is excess

23   income?

24        A.   Excess income which she does not need to

25   support the standard of living comfortably.

1      Q.   Let's take it in parts.  The first thing

2   you need to do is to determine what the total

3   amount of income is available to Mrs. Dwight from

4   all sources including the trust; correct?

5           MR. KOVACK:  Objection.

6           THE WITNESS:  No, the first one is, the

7           trustee shall pay the net income to Patricia

8           Dwight, semi colon -- it's the end of the

9           sentence.  Then, provided, however, if and to

10          the extent the amount of income available

11          from all sources exceeds that which is deemed

12          necessary for the comfortable support, then

13          the excess income shall be distributed to the

14          grantor's living descendents.

15   BY MR. HEMLEY:

16      Q.   So, you understood that the default was

17   to pay the money to Patricia Dwight.  That's the

18   first thing.

19           MR. KOVACK:  Objection, form.

20           THE WITNESS:  When you say default --

21   BY MR. HEMLEY:

22      Q.   Well, absent any other circumstance, Pat

23   Dwight got the money?

24      A.   True.

25           MR. KOVACK:  I object to the form.

BY MR. HEMLEY:

Q.    But, in order to fulfill your duty as fiduciary with the responsibility to the remainderman as well as to income beneficiary, you needed to know whether or not the total amount of income available to Mrs. Dwight from all sources exceeded the amount that would be required to keep her at the level of support and standard of living that she had in 1982; correct?

A.    True.

MR. KOVACK: Objection.

BY MR. HEMLEY:

Q.    And, you understood that in that analysis, the total amount of income that you needed to consider was income from all sources, not just this particular trust; correct?

A.    True.

Q.    So, what steps did you take to determine what the total amount of income available to Mrs. Dwight was in 2002?

A.    A copy of her tax return.

Q.    Anything else?

A.    And, well, the budget gave the expenses but I had conversations with her about --

Q.    I am just talking about income now.

1          A.    Right.  As hard evidence, yes, tax
2    return.
3          Q.    Now, did you look at the tax return?
4          A.    Yes.
5          Q.    And, that was the 2001 tax return?
6          A.    True.
7          Q.    We have that marked as Exhibit No. 3 so
8    you can keep that trust over there and I will
9    show you Exhibit No. 3.  There it is, you have
10   got it.  And the total income that is recited on
11   Exhibit No. 3 is on line 22, 106,713; correct?
12         A.    Well, when we considered the total
13   calculations, when I was trying to do that, I
14   removed the capital gains of 7,005.
15         Q.    Why did you do that?
16         A.    Because we considered that as capital or
17   assets rather than just solely income.
18         Q.    But, you understood that as of the
19   passage of the Connecticut principal and income
20   act, principal could be distributed in order to
21   satisfy income needs; correct?
22         A.    That's under the trust law which has
23   nothing to do with an income tax return.
24         Q.    Do you consider yourself to be an expert
25   in the analysis of income tax returns?

1         THE WITNESS:  Part of the adjusted gross

2     income, yes.

3  BY MR. HEMLEY:

4     Q.   Which is expressed on line 22 as the

5  total income; correct?

6         MR. KOVACK:  Objection.

7         THE WITNESS:  Yes.  True.

8  BY MR. HEMLEY:

9     Q.   And, other than looking at the 2001

10  income tax return, did you do anything else to

11  determine what the total income was that was

12  available to Mrs. Dwight in 2001?

13     A.   Yes, I did ask her if there was any

14  trust from which she was not receiving any income

15  and she said --

16     Q.   Before you get to the answer, why did

17  you ask her that question?

18     A.   Because I think John Dwight said to me

19  that there are perhaps trusts from which she is

20  not taking income.

21     Q.   Why would it be important for you to

22  know whether or not she was taking income from

23  other trusts?

24     A.   Well, it would be income available to

25  her.

1       Q.  It would be part of the total income

2  available?

3       A.  Available to her.

4       Q.  So, you had understood and operated on

5  the assumption that if there was income available

6  to Mrs. Dwight from another trust, that should

7  properly be included in your consideration of the

8  total income available to her under this Russell

9  Dwight trust agreement?

10        MR. KOVACK:  Objection.

11        MS. ALLISON:  Objection to form.

12  BY MR. HEMLEY:

13       Q.  Is that right?

14       A.  True.

15       Q.  So, you asked her because John Dwight

16  had suggested to you that there might be another

17  trust?

18       A.  Yes.

19       Q.  And, how did you raise the question, as

20  best as you can recall, what did you say to

21  Mrs. Dwight and what did she say to you on that

22  subject?

23       A.  I asked her specifically is there any

24  trust from which you are not taking the income to

25  which you are entitled.  And she said the only

```
 1      trust for which she was entitled to take income

 2      from was the John Wineberg trust which was her

 3      father's and then noted on the tax return that

 4      she is taking income from that on her 2001.  And

 5      it was also mentioned actually on the 1982 tax

 6      return so she has always taken income from it.

 7           Q.   Did you ask her whether she was taking

 8      all of the income to which she was entitled from

 9      the John Wineberg trust?

10           A.   No, I didn't ask her that.

11           Q.   Wouldn't that be a significant question

12      along the lines of a question that you did ask,

13      not just are you taking some income but are you

14      taking what you are entitled to take?

15                MR. KOVACK:  Objection.

16      BY MR. HEMLEY:

17           Q.   Wouldn't that be simply to follow along

18      the lines of the inquiry that you were making?

19                MR. KOVACK:  Objection.

20                THE WITNESS:  Well, like I said, what

21           you are entitled to take, since I saw that

22           she was taking it.

23      BY MR. HEMLEY:

24           Q.   Well, you assumed that she was taking

25      everything she was entitled to; right?
```

```
 1           MR. KOVACK:  Objection.

 2           MS. ALLISON:   Objection to form and

 3       foundation.

 4           THE WITNESS:  Well, she is the primary

 5       beneficiary of this account.

 6   BY MR. HEMLEY:

 7       Q.  So, does that mean she gets the money

 8   just by asking for it?

 9       A.  She is entitled to it and that's why we

10   used to ask her to defer it each year in a

11   letter.

12       Q.  So, actually, as far as you are

13   concerned, in your reading of this trust and the

14   bank's reading of this trust, there wasn't any

15   analysis required at all?

16       A.  No, there was analysis required.

17           MR. KOVACK:  Objection.

18           MS. ALLISON:   Objection.

19           THE WITNESS:  -- for the excess income

20       to be distributed to the children of Russell

21       Dwight.

22   BY MR. HEMLEY:

23       Q.  But, the excess is the excess above that

24   which was required to keep her in the 1982

25   standard of living?
```

1          Q.    It wasn't just automatically going to

2     Pat Dwight?

3               MR. KOVACK:    Objection.

4               THE WITNESS:    It hadn't been going

5          automatically.

6     BY MR. HEMLEY:

7          Q.    It shouldn't have gone automatically?

8          A.    No, she is the primary beneficiary.

9     When we consider needs, her needs come first.

10         Q.    I understand that.  But, her simply

11    saying I want it isn't enough?

12         A.    It is enough.

13              MR. KOVACK:    Objection.

14              THE WITNESS:    It is enough.  I mean, if

15         from 1984 we kept giving it to her, I don't

16         think there would have been an issue as to

17         how much excess there is left, if she had to

18         demonstrate it.  I mean, there was something

19         that she was changing from 1984 to 2002.

20    BY MR. HEMLEY:

21         Q.    The language of this trust has been in

22    effect since the day it was created; right?

23         A.    True.

24         Q.    And, the language of the trust requires

25    that some examination be made by the trustee to

```
 1              MR. KOVACK:  Objection.

 2              THE WITNESS:  No, we are required to

 3         look at the excess income to see if the

 4         excess income should go to Russell Dwight's

 5         children.

 6    BY MR. HEMLEY:

 7         Q.   We will do this in small steps.  First,

 8    is it your view, yes or no, that under the terms

 9    of the Russell Dwight trust, any amounts should

10    be paid to Patricia Dwight regardless of her need

11    for the money?

12         A.   No.

13         Q.   In order to determine her entitlement to

14    the amounts available, you need to determine

15    whether her income from all sources exceeds that

16    which is necessary to maintain her 1982 income;

17    correct?

18         A.   True.

19              MR. KOVACK:  Objection.

20    BY MR. HEMLEY:

21         Q.   For the first couple of years she said I

22    am not interested so no analysis was necessary,

23    there wasn't any controversy; correct?

24         A.   True.

25              MS. ALLISON:  Objection to form.
```

1    BY MR. HEMLEY:

2        Q.   But, then there came a time when she

3    said I want the money?

4        A.   Yes.

5        Q.   So, then you had to make the analysis?

6        A.   True.

7        Q.   And, that was in 2002?

8        A.   True.

9        Q.   And, the analysis that you had to make

10   is the one that we have been talking about, what

11   is the total income from all sources?

12       A.   True.

13       Q.   And, was that sufficient to meet her

14   needs?

15       A.   True.

16       Q.   So, we have talked some about the

17   amounts that were available to her.  What did

18   Mrs. Dwight say to you was the reason that she in

19   2002 and not before now needed this income?

20       A.   Because of her medical problems, because

21   she had poor sight, she needed a driver to drive

22   her to places, she couldn't drive anymore.  And

23   she had been hospitalized twice and she needed

24   help around the house and she was going to have

25   somebody come and help her at home and that cost

1  money too.

2      Q.   And, did she say to you that without

3  this income from the Russell Dwight trust, I

4  won't be able to afford this?

5      A.   She did indicate that she had problems

6  in trying to meet her financial obligations.

7      Q.   What did she say to you in that regard?

8      A.   She said, well, my income is not what it

9  used to be and I need extra income for these

10 medical expenses.

11     Q.   And, when she said my income is not what

12 it used to be, did you ask her to demonstrate

13 that to you?

14     A.   Well, in all of our trusts too, we know

15 because the interest rates have been declining,

16 income has been going down too.

17     Q.   Aside from what you know, based on your

18 experience with interest rates, did you ask

19 Mrs. Dwight to demonstrate to you what her income

20 used to be so that you could compare it to what

21 it was in 2002?

22     A.   Well, that's why we asked her to put

23 together not just the income but the expense

24 statement.

25     Q.   We are going to get to the expenses.

1          Q.   So, what did you do to determine what
2     her income was so that you could compare it to
3     what it then was, how did you go about that piece
4     of the analysis?
5               MR. KOVACK:  Objection.
6               THE WITNESS:  Well, that's what we used
7          the 1982 tax returns for, to compare it to
8          the standard of living that she had in 1982.
9          I wasn't just concerned about 2000, 1999 and
10         going back to each and every year.
11    BY MR. HEMLEY:
12         Q.   You weren't concerned about it at all?
13              MS. ALLISON:  Objection to form.
14              THE WITNESS:  No, we were.
15    BY MR. HEMLEY:
16         Q.   Did you look at the 1999, 2000 returns?
17         A.   No, we didn't look at each and every
18    one.
19         Q.   Did you look at any of them?
20         A.   We were supposed to consider her
21    standard of living from 20 years ago.
22         Q.   I am not asking you -- I am asking you a
23    very discreet question.  She said to you, my
24    income is not what it used to be and I am asking
25    you, and the answer apparently is you made no

1    second, that letter that you wrote --

2         A.    Yes.

3         Q.    You say that the discretionary action

4    committee, on the second page you say they

5    reviewed all of the information.  It's on the

6    second page of that letter?

7         A.    True.

8         Q.    What information was included in that?

9         A.    When I sent the first package up to the

10   discretionary action committee, I had the 2001

11   tax return, a request from Mrs. Dwight, the

12   budget and my conversations with her as to her

13   life style from 1982.

14        Q.    Was there another package that went out?

15        A.    No.

16        Q.    You said the first package, was there

17   more than one?

18        A.    No.  That was what was sent to them and

19   we had a discussion on everything.

20        Q.    I just want to -- we will just make a

21   record of what was there.  The 2001 tax return is

22   Exhibit No. 3, that was one of the items that

23   went up there?

24        A.    Yes.

25        Q.    The budget is what is attached to

1    information that we just described?

2        A.    Yes.

3        Q.    And, then on the 22nd, the committee

4    met?

5        A.    Yes.

6        Q.    And they met by telephone?

7        A.    Yes.

8        Q.    And, there were four people present from

9    the committee, it looks like, on the second page?

10       A.    Yes.

11       Q.    Being Iva --

12       A.    Ester.

13       Q.    Ester, yourself, Mr. Boylan and

14   Mr. Kirk?

15       A.    Yes.

16       Q.    Were you a participant in other matters

17   before the discretionary action committee that

18   day besides this one?

19       A.    Yes.

20       Q.    You were a regular member of the

21   committee?

22       A.    Yes.

23       Q.    How many different matters do you recall

24   were taken up by the committee on that day?

25       A.    I don't recollect.

1        Q.   What is a usual or standard, if there is

2   such a thing, number of matters that come before

3   the committee?

4        MR. KOVACK:  Objection to form.

5        THE WITNESS:  It could be as few as two

6      or three, it could be six or seven.

7   BY MR. HEMLEY:

8        Q.   Do you have any recollection as to where

9   this fell within that range?

10        A.   No, I don't.

11        Q.   Do you know how long it was that you

12   spent discussing this matter?

13        A.   No, I don't.

14        Q.   Do you recall what the discussion was?

15        A.   Yes.

16        Q.   Would you share that with me, please?

17        A.   Well, from everything I presented to the

18   committee, and talking about her requesting the

19   income for medical expenses and then we had a

20   discussion about her being the primary

21   beneficiary of this trust.  And then we discussed

22   her budget items and the comments were that some

23   of the budget items seemed fairly high.  But in

24   general the committee was satisfied that they

25   exceeded her income and therefore she should be

1   getting, receiving the income.

2       Q.   So, do I understand that the committee

3   was looking to see whether or not the budget

4   items exceeded her income?

5       A.   The total expenses.

6       Q.   Exceeded her income?

7       A.   Right.

8       Q.   As reported on the 2001 tax return?

9       A.   Yes.

10      Q.   And, that was basically the analysis

11  that was made?

12          MR. KOVACK:  Objection.

13          THE WITNESS:  Yes.

14  BY MR. HEMLEY:

15      Q.   So, let's look at the budget items which

16  are the next page of Exhibit 8.  First of all,

17  these are the third page of Exhibit 8 is the

18  budget that was submitted?

19      A.   Yes.

20      Q.   Where did you get this?

21      A.   From Mrs. Dwight.

22      Q.   Do you know who prepared it?

23      A.   She said somebody was helping her do it

24  by going through a checkbook so I am not sure

25  exactly who, an accountant or --

1    high?

2        A.    Well, what I had done was to try to

3    actually analyze 2001 as actual expenses because

4    the projection -- just to get a sense of whether

5    they were reasonable in terms of the totals put

6    on the budget.  And a lot of them matched the tax

7    return exactly, such as the medical, such as tax

8    prep fees, taxes, ex cetera.  See, those were the

9    ones we were comparing them with and we were

10   trying to figure out the increase, the projected

11   increase which was like over $125,000 and trying

12   to see what items had really actually increased.

13       Q.    If there had been no increase between

14   2001 when the income was being distributed to

15   Mr. Dwight's children, would you have seen any

16   reason to make a reallocation of the

17   distribution?

18             MR. KOVACK:  Objection.

19             MS. ALLISON:  Objection to form,

20       foundation.

21             THE WITNESS:  I mean, it was up to the

22       committee.  If a --

23   BY MR. HEMLEY:

24       Q.    Well, you were a member of the committee

25   so I am asking you.

1      A.   I asked her specifically whether she had

2    long term care insurance and whether that would

3    cover some of the care that she needed at home.

4    And she said she has long term care insurance but

5    it does not cover in home care.

6      Q.   And, now, my question, did you ask her

7    why there was an increase in insurance expense

8    from 2,500 in 2001 to 11,400 in 2002 to 13,000 in

9    2003.  Did you ask her why she was spending more

10   money on insurance, what that was all about?

11     A.   No, I didn't specifically ask her what

12   the increase was for.  I thought it was for the

13   long term care.

14     Q.   Did you ask her why her grooming

15   expenses had more than doubled since 2001?

16     A.   She told me that she had to have

17   somebody come to her house to have her grooming

18   done because to have a driver take her some

19   place, sometimes they had a four hour minimum to

20   drive her to the beauty salon and pick her up.

21   So she was having somebody come over to her home

22   to do it.

23     Q.   I thought she also told you that she was

24   engaging a driver for $200 a day to drive her

25   around?

1          MS. ALLISON:  Objection to form.

2          THE WITNESS:  The driver was not $200 a

3      day.  The live in companion, that's what that

4      was for.

5  BY MR. HEMLEY:

6      Q.   Did she inform you that she was engaging

7  a driver?

8      A.   Yes.

9      Q.   The clothing expense, it went from $323

10  in 2001 to $4,000 in 2003; did you inquire about

11  that?

12     A.   No, not specifically.

13     Q.   Did you inquire as to the $65,000 in

14  gifts in 2003?

15     A.   Yes.

16     Q.   What did she tell you about that?

17     A.   Well, she said that she had children,

18  grandchildren but we weren't considering her

19  gifts as part of her total projected expenses.

20     Q.   So, you backed that out?

21     A.   Right.

22     Q.   Because you understood that that would

23  not be an appropriate basis upon which to base a

24  redistribution of this Russell Dwight income?

25          MR. KOVACK:  Objection.

```
 1           THE WITNESS:  Right, we wouldn't
 2      consider it an expense in the sense that -- a
 3      necessary expense.
 4   BY MR. HEMLEY:
 5      Q.   What effort did you make to determine
 6   whether or not the expenses that are listed on
 7   Exhibit 8 and the budget list existed in any
 8   amount in 1982?
 9      A.   I asked her about her life style in 1982
10   and she told me that there was a cottage in
11   Vermont and she had her condo here in Southport
12   and then there was an apartment in California.
13   So she was obviously 20 years ago in much better
14   health and able to enjoy travel and other aspects
15   of life that she obviously couldn't now, in the
16   state that she was in.
17           So, that was a good comparison and the
18   tax return was a good comparison to see what the
19   $82,000 worth of income in 1982 would have
20   purchased in 2002.  So, taking all those things
21   into consideration, the expensive seemed
22   reasonable and that's what we generally look for,
23   are they reasonable for the life style that she
24   has.  I mean, you don't go to every item and say,
25   well, why is it 2000 more, what did you buy for
```

```
 1        Q.   And, what would you say was the basis
 2   for that final decision?
 3        A.   Because she was the primary income
 4   beneficiary and she was 86 years old and needed
 5   it for her medical expenses.  And her being a
 6   primary beneficiary was also the main
 7   consideration.
 8        Q.   Tell me what you mean by primary
 9   beneficiary and what difference that makes to a
10   review of the trust document.
11        A.   Because her needs have to be considered
12   first.  She is entitled to income first and then
13   the excess is to be distributed to the Dwight
14   children.  They are secondary beneficiaries.
15        Q.   Yes, I understand that.  Without getting
16   into another discussion, you understand that the
17   persons to whom you should distribute the income
18   are a function of the operation of paragraph
19   roman numeral four one --
20        A.   Yes.
21        Q.   -- of the trust?
22        A.   Yes.
23        Q.   Right?
24        A.   Yes.
25        Q.   And, you are not contending that Pat
```

## CERTIFICATION OF SERVICE

This is to certify that on this _15th_ day of October, 2003, a copy of the foregoing has been

mailed by first class mail, postage prepaid, to all counsel and/or pro se parties of record, to wit:

Peter W. Benner, Esq.
Catherine M. Esposito, Esq.
Shipman & Goodwin, LLP
One American Row
Hartford, CT 06103-2819
(*Counsel for the Plaintiff*)

Robert B. Hemley, Esq.
Christina Reiss, Esq.
Gravel and Shea
76 St. Paul Street, P.O. Box 369
Burlington, VT 05402-0369
(*of Counsel for the Plaintiff*)

Robert P. Dolian, Esq.
Cummings & Lockwood, LLC
107 Elm Street, P.O. Box 120
Stamford, CT 06904-0120
(*Counsel for Defendant Patricia W. Dwight*)


_____
Mark J. Kovack