UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

*03CV1770PP MEMO*

2003 DEC 16   A 10: 25

| | |
|---|---|
| JOHN K. DWIGHT, MARGO D. FORBES, : | |
| PATRICIA D. HALLENBECK and : | |
| ELIZABETH D. RICHARDSON, : | CASE NUMBER 303 CV 0177 (WWE) |
| : | |
| Plaintiffs : | |
| : | |
| v. : | |
| : | December 15, 2003 |
| JP MORGAN CHASE BANK, Trustee of : | |
| the Russell S. Dwight, Jr. Trust, and : | |
| PATRICIA W. DWIGHT, : | |
| Defendants : | |

PLAINTIFFS' OPPOSITION TO DEFENDANT JP MORGAN
CHASE BANK'S MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs, John K. Dwight, Margo D. Forbes, Patricia D. Hallenbeck and Elizabeth D.

Richardson ("Plaintiffs") by and through their attorneys, Gravel and Shea, hereby oppose

Defendant JP Morgan Chase Bank's (the "Bank") Motion for Summary Judgment and cross-

move for summary judgment in their favor on all counts of their Amended Complaint.

I.    PRELIMINARY STATEMENT.

In paying all the income of the Russell S. Dwight Trust (the "Trust") to Defendant

Dwight, the Bank has repeatedly breached its fiduciary duties to Plaintiffs and has abused its

discretion in its role as successor trustee. The Bank determined to direct all of the income to

Defendant Dwight without regard to the direction of the Trust, and without investigating a series

of unsubstantiated representations of need it received from Defendant Dwight's attorney. These

representations, including that Defendant Dwight would be engaging a live-in companion and a

driver and anticipated an increase of medical expenses of $72,000.00, proved to be false, but even after learning the truth, the Bank has continued to misdirect the Trust income.

The undisputed facts reveal that the Bank negligently and recklessly violated its fiduciary duties to Plaintiffs, abused its discretion, and failed to carry out Russell Dwight's intent as unambiguously set forth in the Trust Agreement. Plaintiffs are entitled to summary judgment in their favor, and as sought in their earlier filed motion for partial summary judgment, the Bank should be immediately removed as Trustee.

II.    STATEMENT OF UNDISPUTED FACTS.

A.    The Standard Of Living Enjoyed By Russell And Defendant Dwight.

Russell Dwight and Defendant Dwight were married in 1973. Plaintiffs' Statement, ¶14. At the time, Defendant Dwight was 58. *Id.* It was a second marriage for each spouse and each of them had grown children from a prior marriage. *Id.* Russell Dwight was retired during all but the first few years of the marriage. *Id.* At the time of her marriage to Russell Dwight, Defendant Dwight owned her own home and had in excess of a million dollars of her own money. Plaintiffs' Statement, ¶15. In addition, Russell Dwight was aware that Defendant Dwight was receiving money from her father's trust, the John Wineberg Trust, during the course of their marriage. *Id.* Defendant Dwight spent the money she received from the Wineberg Trust on "presents, gifts and on telephone calls." *Id.*

The Trust Agreement was executed in 1982. Plaintiffs' Statement, ¶16. In that same year, Russell Dwight and Defendant Dwight reported to the I.R.S. total income in the amount of $106,682.00. *Id.* At the time, neither spouse had any wages and the income they reported

- 2 -

included dividends of $60,572.00 and capital gains of $24,479.00. *Id.* The Trust Agreement provides, in relevant part, at Article IV.1 that:

> Upon Grantor's death, the Trustee shall pay the net income of the Trust Estate to or apply for the benefit of Grantor's wife, PATRICIA W. DWIGHT, during her lifetime or until her remarriage; provided, however, if and to the extent that the total amount of income available to Grantor's wife from all sources, including this trust shall, from time to time, in the sole judgment of the Trustee, exceed that which is deemed necessary for the comfortable support at the standard of living theretofore maintained by Grantor and his wife, then the Trustee shall distribute such excess income to or for the benefit of Grantor's then living descendants, per stirpes.

Plaintiffs' Statement, ¶¶ 16; 56.

From the creation of the Trust in 1982 until August 29, 2002, Defendant Dwight advised Defendant Bank that: "I have no current need, nor do I wish any of the income from the Trust until further notice." Plaintiffs' Statement, ¶7.

**B.    Defendant Dwight's Request For All Of The Trust Income.**

On August 29, 2002, Defendant Dwight's attorney, John Musicaro, provided Defendant Bank with a letter requesting that Defendant Dwight receive "all of the income" from the Trust. Plaintiffs' Statement, ¶20. She specifically referenced the need to hire a live-in companion "for health reasons," and anticipated the cost to be $200.00 daily. Plaintiffs' Statement, ¶17. In a subsequent conversation, Defendant Dwight advised the Bank that she would be incurring "$72,000 per year for live-in companion and other expenses." *Id.* Defendant Dwight did not in fact incur these expenses and the Bank made no effort to determine whether she had in fact done so or to revisit its decision once it determined the representations it relied upon were false. *Id.* Defendant Dwight further advised the Bank that she would be hiring a driver to take her to her

- 3 -

appointments. She did not do so and instead merely continued to hire drivers when needed on an hourly basis. Plaintiffs' Statement, ¶18.

C.    The Bank's Initial Decision To Suspend Distributions To Plaintiffs.

After receiving Defendant Dwight's August 29, 2002 correspondence requesting all of the income from the Trust, by correspondence dated September 10, 2002, the Bank advised Plaintiffs that it would suspend all distributions from the Trust to them. Plaintiffs' Statement, ¶20. This communication took place *before* the Bank had reviewed any tax returns, budgets or other financial information from Defendant Dwight. *Id.* The Bank's account manager for the Trust, Ms. Amembal, admits that she did not engage in any investigation before suspending payments of the Trust's income to Plaintiffs. Plaintiffs' Statement, ¶21.

Thereafter, all of the Bank's actions were directed to ensuring that Defendant Dwight receive all of the income of the Trust. As early as September 11, 2002, Ms. Amembal was asking Defendant Dwight whether she wanted to receive the Trust income by direct deposit or by check, noting to herself that "Defendant Dwight will send me info re transfer for 1st of month (starting in Oct.)." Plaintiffs' Statement, ¶22. On September 20, 2002, Ms. Amembal made a note to herself to "[s]et-up a monthly tickler for 100% of the net income [of the Trust to go to Defendant Dwight] starting 10/1/02." Plaintiffs' Statement, ¶23. On September 26, 2002, Ms. Amembal had a telephone conversation with Defendant Dwight in which she "[t]old her that income will go in starting November 1st. Told her I spoke to John Musicaro [Defendant Dwight's attorney] & he said ok." Plaintiffs' Statement, ¶24.

- 4 -

D.    Plaintiffs Raise Concerns Regarding The Bank's Fulfillment Of Its Fiduciary Duties.

By correspondence to the Bank dated September 18, 2002, Plaintiffs raised concerns regarding the Bank's decision to cease all distributions to them and regarding the lack of any analysis of the Trust Agreement's standard for distributing income to Defendant Dwight. Plaintiffs' Statement, ¶25. On October 29, 2002, Plaintiff John Dwight discussed the Trust Agreement with Ms. Amembal and told her that she needed to do a before and after analysis of Defendant Dwight's standard of living. Plaintiffs' Statement, ¶26. In other words, she needed to compare the standard of living Defendant Dwight shared with Russell Dwight in 1982 at the time the Trust Agreement was drafted with the standard of living she now enjoyed to determine whether she had sufficient income available to her from all sources to support herself in her former lifestyle. *Id.*

It was only after Plaintiffs raised concerns regarding the Bank's decision to suspend distributions to them without any analysis required by the Trust Agreement that the Bank requested financial information from Defendant Dwight. Plaintiffs' Statement, ¶27. Notwithstanding the Bank's purported need for information, in this same communication, the Bank advised Defendant Dwight that the Bank "may have income to give her starting Dec. 10." *Id.* Ms. Amembal further advised Defendant Dwight's lawyer that Defendant Dwight would get the money when she, Ms. Amembal, received the financial information but that "it will probably be not October 1, more like November 1." Plaintiffs' Statement, ¶28. Ms. Amembal nonetheless denies that she "prejudged" the matter. *Id.*

- 5 -

The Bank never asked for Defendant Dwight's 1982 expenses or budget items. Plaintiffs' Statement, ¶29. It also never asked Plaintiffs about the lifestyle of their father and Defendant Dwight in 1982. *Id.* The Bank admits that the income shown on a tax return is "frequently" not a reflection of standard of living. *Id.* The Bank did not determine that the request for the Trust's income, which was prepared by Defendant Dwight's attorney, was made at or around the same time as Defendant Dwight met with her attorney for estate planning issues or that Defendant Dwight was aware that the Trust's assets would go to Plaintiffs upon her death. *Id.*

 E. Defendant Dwight's Provision Of Financial Information.

By correspondence dated November 1, 2002 sent by her attorney, Defendant Dwight submitted a budget of her actual and projected expenses and her 2001 tax return. Plaintiffs' Statement, ¶30. She did not prepare the budget, did not discuss its preparation, and did not review the budget before it was submitted to the Bank. *Id.* When asked in deposition if the budget items were accurate, Defendant Dwight testified that "some things I guess are and some aren't." *Id.* She acknowledged that she did not ask that the budget be prepared or direct anyone to submit it on her behalf. *Id.*

 F. The D.A.C.'s Analysis Of Defendant Dwight's Budget.

The Bank's D.A.C. met by telephone on November 22, 2002. They considered only three items of information: Defendant Dwight's August 29, 2002 correspondence, her actual and projected budget and her 2001 tax return in deciding whether to give her all of the income of the Trust. Plaintiffs' Statement, ¶31. The Bank made no inquiry into the following increases in

- 6 -

expenses from 2001 to 2003 shown on Defendant Dwight's budget and did nothing to verify their accuracy:

| | |
|---|---|
| **Insurance:** | $2,640.00 to $13,000.00 |
| **Income taxes from:** | $5,346.00 (2002) to $75,000.00 |
| **Clothes, Cleaners, Dressmaker:** | $323.00 to $4,000.00 |
| **Hunt Club:** | $3,550.00 to $4,000.00 |
| **Home Improvements:** | $0 to $6,000.00 |
| **Professional Fees:** | $1,675.00 to $5,400.00 |
| **Professional Subscriptions:** | $1,400.00 to $1,400.00 |
| **Subscriptions, Dues, etc.:** | $258.00 to $1,500.00 |
| **Visa:** | $12,000.00 to $20,000.00 |
| **Gifts:** | $48,000.00 to $65,000.00 |

Plaintiffs' Statement, ¶32. Defendant Dwight's medical expenses, as shown on her budget, were projected to increase by only approximately $2,000.00. Plaintiffs' Statement, ¶33.

Jeffrey Boylan, the Bank's manager of its Manhattan office for personal asset management and trust assets, testified that it was "reasonable to consider whether budget items could be reduced" but does not recall the D.A.C. making such an inquiry. Plaintiffs' Statement, ¶34. Ms. Amembal testified that the D.A.C. excluded Defendant Dwight's income taxes and gifts in analyzing her budget but added back in $21,000.00 in income taxes. Plaintiffs' Statement, ¶35. If income taxes and gifts are excluded from Defendant Dwight's budget, by her own submission, which is disputed, she experienced only a $7,000.00 increase in expenses, but was nevertheless given *all* of the Trust's income (approximately $40,000.00). *Id.* Mr. Boylan testified that the inclusion of gifts in the budget was acceptable although he agreed that the increase in Defendant Dwight's income taxes for her capital gains did not reflect an increase in need. *Id.*

- 7 -

G.    The D.A.C.'s Analysis Of Defendant Dwight's "Income Available . . . From All Sources."

The D.A.C.'s analysis of "income available to Defendant Dwight from all sources" consisted only of looking at Defendant Dwight's 2001 tax return. Plaintiffs' Statement, ¶36. The Bank concedes, however, that Defendant Dwight's 2001 tax return only shows taxable distributions and income actually received and that "the question . . . asked by the trust is not what did you actually take but what is the amount of income available to you." Plaintiffs' Statement, ¶37. At the time of Defendant Dwight's request for the income of the Trust, her 2001 tax return revealed total income of $106,173.00. Plaintiffs' Statement, ¶38. According to Ms. Amembal, the D.A.C. decided not to consider the capital gains declared on the 2001 tax return as income "[b]ecause we considered that as capital or assets rather than just solely income." Plaintiffs' Statement, ¶36.[1] Ms. Amembal nonetheless agrees that capital gains are part of a taxpayer's adjusted gross income. *Id.* In contrast, Mr. Boylan, also a member of the D.A.C., testified that there was no discussion of the capital gains treatment at the D.A.C.'s telephone meeting to consider Defendant Dwight's request. *Id.* As demonstrated above, capital gains were a significant portion of Russell and Defendant Dwight's income in 1982. *Id.*

---

[1] In deposition, Mr. Boylan, initially did not exclude Defendant Dwight's capital gains in determining Defendant Dwight's 2002 income but changed his testimony on this point after taking a break from his deposition to consult with the Bank's counsel. Plaintiffs' Statement, ¶36. Mr. Boylan, however, conceded that capital gains are included in taxable income and that the Bank follows the I.R.S.'s definition of taxable income. *Id.*

- 8 -

H.    Plaintiffs Prompt The Bank's Inquiry Into Other Sources Of Available Income.

The Bank asked Defendant Dwight about other sources of income only because Plaintiff

John Dwight told the Bank it should do so. Plaintiffs' Statement, ¶39. In response to the Bank's

request for information regarding the existence of other income, Defendant Dwight disclosed the

existence of the Wineberg Trust which had assets in excess of $1.8 million dollars as of

December 31, 2000. Plaintiffs' Statement, ¶40. The Bank did not ask whether Defendant

Dwight was taking all of the income to which she was entitled under the Wineberg Trust, did not

examine the Trust document, and did not examine any account statements for the Wineberg

Trust. *Id.*

At the time her request for all of the income of the Trust was made, Defendant Dwight

also had assets in a Prudential Securities account in excess of $3,000,000.00. Plaintiffs'

Statement, ¶41. Defendant Dwight's personal portfolio of stocks and bonds had increased to $3

million from $1 to $1.5 million when she was married to Russell Dwight. Plaintiffs' Statement,

¶19. Defendant Dwight has, at all times, had the unrestricted ability to withdraw funds from her

Prudential Account and has regularly done so to obtain "a more steady income." *Id.* The Bank

did not consider the Prudential account in its analysis[2] and in fact did not ask any questions about

---

[2] The Bank relies upon the statements of the drafter of the Trust, Attorney See, that only
Defendant Dwight's income need be examined and that Defendant Dwight was "number one" and the
"primary beneficiary" to be protected by the Trust. Plaintiffs' Statement, ¶42. The Bank does not
disclose that Attorney See is currently a member of the firm representing the Bank. *Id.* Moreover, with
regard to other trusts it administers, the Bank has conceded that under the Connecticut Principal
and Income Act, "if there is an instrument where the beneficiary can only receive income and no
principal, we can still look at the entire account and give them a percentage of the market value
of the account." *Id.*

- 9 -

the account including questions about whether the money was invested in a manner which would produce a reasonable amount of income. Plaintiffs' Statement, ¶41.

I.     The Bank's Understanding Of Its Fiduciary Duties Under The Trust Agreement.

Ms. Amembal, a member of the Bank's D.A.C., testified that in order to determine Defendant Dwight's entitlement to income from the trust, you need to determine whether her income from all sources exceeds that which is necessary to maintain her 1982 income. She has also testified, however, that analysis is required only for the "excess income to be distributed to the children of Russell Dwight . . . [a]fter you pay the initial income to her." Plaintiffs' Statement, ¶43.

Mr. Boylan, also a member of the D.A.C., testified that he interprets the Trust Agreement as requiring the Bank to exercise its discretion only if it is distributing income to someone other than Defendant Dwight. Plaintiffs' Statement, ¶44. He does not agree that "once it has been determined that the income available to Mrs. Dwight from all sources exceeds that which is necessary for her support at the standard of living maintained along with Russell Dwight, it is mandated to give [the] income to the Dwight children." *Id.*

The Bank has described its approach to the analysis required by the Trust as follows: "absent any other circumstance, Pat Dwight got the money," and that Defendant Dwight "saying I want [the income] was enough," that "it was enough just to ask for it," and that "the instrument directs that [Defendant Dwight] gets to be paid the net income." Plaintiffs' Statement, ¶45.

- 10 -

J.    The D.A.C.'s Decision To Distribute All Of The Trust Income To Defendant Dwight.

The D.A.C.'s analysis of Defendant Dwight's request for all of the income of the Trust was recorded by Ms. Amembal in full as follows: "Even though some budget items are high, on the whole the expenses are higher than the income." Plaintiffs' Statement, ¶46. The D.A.C. thus determined that Defendant Dwight's budget revealed total expenses which exceeded the income on her 2001 tax return: "that was the analysis." *Id.* The reason for the D.A.C.'s decision was recorded by Ms. Amembal as follows:

> "I told the Committee how Patricia Dwight's attorney threatened to sue us if she didn't get the income & the natural children of John Dwight also felt they deserved the income. Committee said we might have a problem in the future, but for now the best course is to give the 86 year old lady income for her medical expenses."

Plaintiffs' Statement, ¶47.

The D.A.C. advised Plaintiffs that its decision to give Defendant Dwight the income from the Trust was "because of the increase in her medical expenses." Plaintiffs' Statement, ¶48. The Bank concedes that Defendant Dwight's medical expenses were projected to increase by only approximately $2,000.00 from 2001 to 2003. *Id.* The decision of the D.A.C. makes no reference to "income available to Grantor's wife from all sources" or to the "standard of living theretofore maintained by Grantor and his wife." Plaintiffs' Statement, ¶11.

K.    The Bank's Fiduciary Obligation To Engage In A Continuing Analysis.

The Bank acknowledges that it has a fiduciary duty to the Dwight children as well as to Defendant Dwight. Plaintiffs' Statement, ¶49. The Bank further acknowledges that it has an obligation to make a continuing evaluation of how the Trust's income should be distributed.

- 11 -

Plaintiffs' Statement, ¶50. By correspondence dated December 6, 2002, the Bank informed Plaintiffs of the D.A.C.'s decision that "all net income should now be distributed to Patricia Dwight for her medical expenses." Plaintiffs' Statement, ¶51. The Bank stated that it "will be reviewing her income and expenses on an on-going basis and will inform you immediately if there is any excess income available for you and your three sisters." *Id.*

The Bank agrees that if Defendant Dwight did not get a live-in companion as represented, that would affect its decision. Plaintiffs' Statement, ¶52. The Bank has known at least since June 24, 2003, the date of Defendant Dwight's deposition, that this alleged expense was not actually incurred. *Id.* Nor have her expenses for drivers or other helpers increased by the amounts projected. Her drivers are paid $15.00 to $25.00 per hour and come only when needed. Her use of cleaning persons is as it was previously. *Id.*

After the Bank announced its decision to distribute all of the Trust's income to Defendant Dwight, she filed a 2002 tax return revealing $476,809.00 in income. Plaintiffs' Statement, ¶53. Defendant Dwight's 2002 tax return does not indicate the represented $72,000.00 increase in medical expenses. *Id.* The Bank did not reconsider its decision after receiving Defendant Dwight's 2002 tax return. Plaintiffs' Statement, ¶54. Despite Plaintiffs' requests and the Bank's promise to do so, the Bank has engaged in no subsequent reviews of its decision to give Defendant Dwight all of the Trust income. *Id.*

III.    ARGUMENT.

    A.    <u>Standard Of Review.</u>

Notwithstanding its recent arguments that disputed issues of material fact preclude the Court from granting Plaintiffs' Motion for Partial Summary Judgment on the issue of trustee removal, the Bank now deems summary judgment appropriate because its "burden does not require Chase to disprove the Plaintiffs' claims, but is discharged simply by demonstrating an absence of evidence in support of the opponent's claims." Bank's Memo., p. 5. The Bank claims that, as a matter of law, there is no evidence of a breach of fiduciary duty, an abuse of discretion, bad faith, improper motives, negligence or recklessness.[3] In urging the Court to accept these blanket statements, the Bank suggests that the Trust Agreement's use of the term "sole judgment" requires a limited and deferential standard of review. The Court's scope of inquiry, however, is significantly broader:

> In determining whether the trustee is acting within the bounds of a reasonable judgment the following circumstances may be relevant: (1) the extent of discretion intended to be conferred upon the trustee by the terms of the trust; (2) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (3) the circumstances surrounding the exercise of the power; (4) the motives of the trustee in exercising or refraining from exercising the power; and (5) the existence or non-existence of an interest in the trustee conflicting with that of the beneficiaries.

A. Scott, *The Law of Trusts*, Control of Discretionary Powers § 187, p. 1501 (3d ed. 1967).

Application of this standard to the matter before the Court reveals that the evidence relevant to

---

[3] The Bank inconsistently describes its request for summary judgment as embracing Counts I, III and IV of the Amended Complaint, Bank's Motion, p. 1; Bank's Memo., p. 1 and as including "Counts I, II and IV of the Plaintiffs' Amended Complaint." Bank's Memo., p. 14.

the Bank's failure to perform its fiduciary obligations is ample and undisputed and supports each of Plaintiffs' claims as a matter of law.

B.     <u>The Bank's Suspension Of Distributions To Plaintiffs And Decision To Distribute The Trust Income To Defendant Dwight Occurred Before Any Investigation Or Analysis And Was An Abuse Of Discretion And A Breach Of Its Fiduciary Duties To Plaintiffs.</u>

The Bank's own records and the testimony of its representative, Ms. Amembal, render it beyond dispute that the Bank made at least an initial decision to give Defendant Dwight the Trust's income before any analysis of any kind was undertaken. Plaintiffs' Statement, ¶¶ 10, 11. Ms. Amembal, herself, admits that no investigation took place before distributions to Plaintiffs were suspended and her records reveal that on no less than four occasions she told Defendant Dwight or her attorney that an income distribution would be made prior to any review of any financial information and prior to any consideration by the Bank's D.A.C. Plaintiffs' Statement, ¶¶ 10, 11. This in and of itself was an abuse of discretion and an abdication of the Bank's fiduciary duties. *See Kolodney v. Kolodney,* 503 A.2d 625, 628 (Conn. Ct. App. 1986) (trustee's failure to inquire as to sums necessary to maintain beneficiary's "comfortable maintenance, support and education" under trust instrument providing this standard constituted an abuse of discretion); *see also In re Murray,* 45 A.2d 636, 639 (Me. 1946) (trustees with "absolute discretion" to pay principal for comfortable support and maintenance of testator's widow who left such determination to widow," thereby surrendered their discretion to her," "did not use their own judgment" and "did not determine whether the conditions specified in the will existed").

The Bank seeks to avoid the consequences of Ms. Amembal's lack of investigation and analysis by claiming that *after-the-fact* (and solely at Plaintiffs' prompting), an inquiry into

- 14 -

Defendant Dwight's finances was eventually made. As demonstrated below, this inquiry was guided by a standard not authorized by the Trust Agreement and reflected a result-oriented analysis intended to buttress the Bank's initial decision and protect it from a lawsuit from Defendant Dwight.

C.     The Bank's After-The-Fact Analysis Was Guided By A Flawed Interpretation Of The Trust Agreement.

The Bank has described the circumstances which would trigger an income distribution from the Trust to Defendant Dwight as follows: "[A]bsent any other circumstance, Pat Dwight got the money," Defendant Dwight "saying I want [the income] was enough," "it was enough just to ask for it," and "the instrument directs that [Defendant Dwight] gets to be paid the net income." Plaintiffs' Statement, ¶45. This approach is consistent with the Bank's designation of Defendant Dwight as the Trust's "primary income beneficiary" and "number one" among the Trust's beneficiaries with Plaintiffs being "characterized" by the Bank and Defendant Dwight as only "contingent" beneficiaries who must prove their entitlement to the Trust's income. Bank's Memo., p. 9 and fns. 1, 2. The Bank has described its standard for income distributions to Plaintiffs as follows:

> "Clearly, Mrs. Dwight is the primary beneficiary of the Trust and the Plaintiffs are in no position to insist that they receive trust income unless and until it has been demonstrated to Chase's reasonable satisfaction that the conditions necessary for a change have been met."

Bank's Memo., p. 9.

The Bank's standards for income distributions from the Trust are not authorized by the plain language of the Trust Agreement. The Trust Agreement does not identify Defendant

- 15 -

Dwight as the "primary beneficiary" and it is certainly not enough for her to merely ask for the income of the Trust to receive it, nor is the standard that "absent any other circumstances, Pat Dwight got the money." Correspondingly, the Trust Agreement does not require Plaintiffs to demonstrate anything to "Chase's reasonable satisfaction" much less require them to establish "the [undefined] conditions for a change have been met" before an income distribution to them may take place.

Instead, Russell Dwight set out a clear standard for determining when his second wife would receive the Trust's income and when his children would do so. This standard required the Bank to do two things: (1) determine Defendant Dwight's income available from all sources; and (2) determine if it was sufficient to maintain her "comfortable support at the standard of living theretofore maintained by Grantor and his wife." Plaintiffs' Statement, ¶ 11; Exhibit W. The undisputed facts reveal that the Bank did not believe it was guided by this standard in distributing income to Defendant Dwight.[4] There is no rational, good faith explanation for the Bank's approach. *See Scott on Trusts* § 187 at p. 1502 (. . ."the court will control [the trustee's] action where he acts in bad faith. The real question is whether it appears that the trustee is acting in that state of mind in which it was contemplated by the settlor that he should act"). Moreover, even were the Bank to somehow prove it created its standard for income distributions in good faith, this would not excuse the Bank from liability:

---

[4] The Bank's statement that, "[c]learly, the Grantor intended for Chase to have the greatest discretion possible," Bank's Memo., fn. 3, is itself indicative of the Bank's misunderstanding of the standard set forth in the Trust Agreement for income distributions to Defendant Dwight. The Bank's discretion is by no means unfettered but rather reflects the settlor's "intention that the trustee should consider the . . . means of support of the beneficiary which are unconnected with the trust in deciding how much trust income should be paid or applied for support." *Restatement (Second) of Trusts* § 811.

A trustee commits a breach of trust not only when he violates a
duty in bad faith, or intentionally although in good faith, or negligently,
but also where he violates a duty because a mistake as to the extent of his
duties and powers. This is true not only where his mistake is in regard to a
rule of law, whether a statutory or common-law rule, but also where he
interprets the trust instrument as authorizing him to do acts which the
court determines he is not authorized by the instrument to do. In such a
case, he is not protected from liability merely because he acts in good
faith, nor is he protected merely because he relies upon the advice of
counsel. If he is in doubt as to the interpretation of the instrument, he can
protect himself by obtaining instructions from the court. The extent of his
duties and powers is determined by the trust instrument and the rules of
law which are applicable, and not by his own interpretation of the
instrument or his own belief as to the rules of law.

*See Restatement (Second) Trusts* § 201, Comment a (citations omitted). Because the Bank

created its own standard for income distributions which were inconsistent with the plain

language of the Trust, it violated its fiduciary duties and abused its discretion as a matter of law.

The Trust Agreement's use of the term "sole judgment" does not alter this result.

      D.    <u>The Trust Agreement's Use Of The Term "Sole Judgment" Does Not Negate The
Bank's Liability For Failure To Adhere To The Trust Agreement.</u>

The Trust Agreement's use of the term "in the sole judgment of the Trustee" does not

immunize the Bank from liability for creating standards for income distributions which clearly

violate Russell Dwight's clear intent. As a leading commentator notes:

Sometimes the settlor describes the discretion which his trustee is to have
as "absolute", "uncontrolled", "complete", or "full", or words with similar
import . . . Notwithstanding the fact that a literal interpretation of these
grants of absolute and uncontrolled discretionary power would seem to
sanction any action taken by the trustee thereunder and to leave the courts
powerless to intervene, such a construction has not been given to them.
The settlor has created a trust to accomplish certain objectives. Although
he gives his trustee great freedom of action and administration of the trust,
he surely must intend the qualification that the trustee shall act with some
regard to the purposes of the trust and not make decisions which frustrate

- 17 -

> the accomplishment of the settlor's intent, and that he employ his discretion deliberately and with some thought and not recklessly or capriciously but in a spirit of good faith and honesty.

G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 560 (2003).[5]  Accordingly, the "sole judgment" provision of the Trust does not excuse the Bank's failure to adhere to the plain language of the Trust Agreement and its reckless and improper promises to Defendant Dwight that she would receive the Trust's income before any analysis took place.  Correspondingly, it also does not excuse the Bank's failure to deal with the beneficiaries of the Trust impartially. *See Gimbel v. Gimbel Foundation, Inc.*, 347 A.2d 81, 88 (Conn. 1974) ("Although the settlor imparted to the trustees the widest possible discretion, they are, nonetheless, under a duty to deal impartially with the successive beneficiaries) (quoting *Restatement (Second) of Trusts* § 183 ("when there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them")).  There is therefore no justification for the Bank's decision to treat Defendant Dwight as "number one" under the Trust Agreement or for taking the approach that the income of the Trust was hers for the asking.

---

[5] *See also Connor v. Hart,* 253 A.2d 9, 14 (Conn. 1968) ("Although the use of the term 'sole discretion' confers a wide discretion, no language in a trust will be so construed as to remove a trustee from equitable control . . . the law will not tolerate its abuse, however great the creator of the trust intended the grant of discretion to be.' This rule applies even when the will has used the term 'absolute' or 'sole' discretion") (citations omitted); *Scott on Trusts* § 187, p. 1502 ("The extent of [a trustee's] discretion may be enlarged by the use of qualifying adjectives or phrases such as 'absolute' or 'uncontrolled.' Even the use of such terms, however, does not give him unlimited discretion.  A good deal depends upon whether there is any standard by which the trustee's conduct can be judged."); *accord Rollins v. Helvering,* 92 F.2d 390, 393 (8th Cir. 1937) ("As a general rule of law, we may accept the statement that a discretion lodged in a trustee is rarely, if ever, a permit to act arbitrarily.").

Because it is beyond dispute that the Bank's standards for income distributions are inconsistent with those set forth in the Trust Agreement, this Court may decide the issue as a matter of law and grant summary judgment in Plaintiffs' favor. *See Over the Road Drivers, Inc. v. Transport Ins. Co.*, 637 F.2d 816, 818-19 (1st Cir. 1980) (when extrinsic evidence demonstrates that only one possible interpretation of an agreement is reasonable, the court may grant summary judgment in favor of that interpretation).

  E. <u>The Bank's After-The-Fact Investigation And Analysis Were Inadequate And Inconsistent With The Trust Agreement.</u>

The Bank repeatedly asserts: "The language of the Trust Agreement at issue here is clear, and Chase's exercise of its discretionary powers thereunder is entirely consistent with the plain meaning of the instrument itself as a matter of law." Bank's Memo., pp. 4, 6, 8, 10. Wholly absent from this mantra, however, is any conclusion the Bank reached as to what Defendant Dwight's income "available from all sources" was in 2002 and whether her income in 2002 was sufficient for her comfortable support in the standard of living she shared with Russell Dwight in 1982. Indeed, the Bank does not even suggest that it reached this conclusion. Instead, it distributed the Trust's income to Defendant Dwight for her "medical expenses" because she "asked for it" and because her "expenses exceeded her income." Plaintiffs' Statement, ¶¶ 45-48. These conclusions are insufficient to justify an income distribution to Defendant Dwight and not supported by a mere rote recitation of the information the Bank reviewed at Plaintiffs' insistence. On this point, the leading commentators are consistent:

> . . . if the trustee has gone through the formality of using his discretion but has not deliberately considered the arguments pro and con, and thus has made a decision for no reason at all, his conduct can be characterized as

> arbitrary and capricious, as amounting to a failure to use his discretion, as not in performance of his duty with regard to the discretionary power, and as warranting the court to require a reconsideration by the trustee or some other relief.

*Bogert's Trusts and Trustees* § 560, p. 195.

> Where by the terms of the trust a discretionary power is conferred upon the trustee and the exercise of power is left to his judgment, the court will interpose if the trustee fails to use his judgment. This is true even though what is done by the trustee or what he fails to do would have been proper if he had used his judgment. Where he does not use his judgment, he has not acted in the state of mind in which it was contemplated by the settlor that he should act. . . . So also his conduct is arbitrary and the court may interpose where he is authorized to make payments to a beneficiary if in his judgment he deems it wise and refuse to inquire into the circumstances of the beneficiary.

*Scott on Trusts* § 187.3, pp. 1518-19.

Because the Bank's after-the-fact analysis did not answer the questions required by the Trust Agreement to determine who should receive income distributions from the Trust, it abused its discretion and breached its fiduciary duty to perform the analysis required by that instrument. Because the Bank does not even claim it reached the conclusions required by the Trust Agreement, there are no factual disputes which would preclude this Court from deciding this issue as a matter of law in Plaintiffs' favor.

F.    **If Performed Properly, The Analysis Required By The Trust Agreement Would Have Mandated The Denial Of Defendant Dwight's Request.**

Had the Bank engaged in the proper investigation and analysis, it would have concluded that Defendant Dwight, through her counsel, artificially inflated the expenses set forth in a budget which she did not prepare, review or direct to be prepared. Plaintiffs' Statement, ¶32. This budget included gifts in the amount of $65,000.00 – an amount more than the total yearly

- 20 -

income of the Trust. If Defendant Dwight's gifts and taxes are excluded from her budget, as they should be, Defendant Dwight experienced a total increase in expenses of approximately $7,000.00. Plaintiffs' Statement, ¶35. Even according to the Bank's self-created standard for distributing income to Defendant Dwight, this would not have justified a decision to grant Defendant Dwight's request for *all* of the Trust's income.

Similarly indefensible and result-oriented was the Bank's decision to exclude Defendant Dwight's capital gains from her income contrary to well-established law. *See Merchants' Loan & Trust Co. v. Smietanka,* 255 U.S. 509 (1921). The Bank's approach, which obviously supports the conclusion it sought to reach, ignores the fact that capital gains were a substantial part of the income reported by Russell Dwight and Defendant Dwight in 1982. Likewise, had the Bank made any attempt to verify Defendant Dwight's alleged increases in medical expenses which it represented to Plaintiffs were "the reason" it granted Defendant Dwight's request, it would have discovered that the alleged medical expenses of approximately $72,000.00 were never incurred, were not reflected in Defendant Dwight's 2002 tax return, and were not even included in her projected budget which reflected an increase in medical expenses of only approximately $2,000.00. Such an inquiry by the Bank would not have required Defendant Dwight to "swear an oath,"[6] it would merely require the Bank to carefully examine the information presented to it,

---

[6] The Bank's hyperbole that it cannot be faulted for failing to require to Defendant Dwight to "swear an oath" or "demand for Mrs. Dwight to 'down size' or sell her home or other belongings instead of turning to the Trust income," Bank's Memo., p. 12., should be disregarded. The Bank is well aware that Defendant Dwight is a multi-millionaire in her own right with ample assets and income at her disposal. Her "need" for the Trust's income of approximately $40,000.00 per annum could be addressed simply by refraining from giving gifts of $65,000.00. In any event, Plaintiffs have never requested at any time that Defendant Dwight sell her house or her belongings, nor is there any reasonable risk that she would need to do so. A cynic might even suggest that the whole notion of a need for income was not

note the clear discrepancy in Defendant Dwight's representations versus the facts, and inquire further. This is not an unreasonable burden imposed by Plaintiffs. Rather, it is one required by law:

> Insofar as future payments are concerned, any trustee undertaking to exercise the discretion granted by the will, must inquire into all relevant facts and circumstances existing at that particular time and must determine in the light of such particular facts and circumstances how discretion may be best exercised within the limits of the authority granted by the will. Failure to make reasonable investigation might well constitute arbitrary and capricious action that would render the trustees liable to the estate for any loss incurred.

*In re Estate of Carter,* 182 N.Y.S.2d 530, 532 (1958); *see also In re Murray,* 45 A.2d at 639 (trustees liable where "they did not use their own judgment. They did not determine whether the conditions specified in the will existed. The trustees did not ascertain the true facts, knowledge of which was chargeable to them"); *Bridgeport-City Trust Co. v. Beach,* 119 Conn. 131, 134 (1934) (where beneficiary was entitled to net income to extent "necessary for his comfortable support and maintenance, testator's words meant actual need and trustee was obligated to consider and reasonably take into account the beneficiary's income from other sources); *Kolodney,* 503 A.2d at 628 ("use of 'sole discretion' in trust instrument did not excuse trustee from duty to distribute income for beneficiary's 'comfortable maintenance, support and education,' it follows that he had a duty to inquire as to what sums were necessary to maintain that standard of living. His failure to do so constituted an abuse of discretion").

---

Defendant Dwight's idea. The request came from her attorney whom she had been consulting for estate planning. Defendant Dwight was unaware of the origin of the budget; and every dollar obtained from the Dwight Trust was at the expense of the Dwight children and to the benefit of Defendant Dwight's children and heirs.

Finally, had the Bank honored its promise to Plaintiffs to engage in an "ongoing analysis" of Defendant Dwight's request, it would have been forced to reconsider its decision to distribute all of the Trust's income to her because Defendant Dwight reported taxable income in 2002 in the amount of $476,809.00 – four times the 1982 income of her and Russell Dwight. The Bank's failure and refusal to re-examine its decision even when it became aware of the medical expenses upon which it relied had not been incurred belies any claim that the Bank acted in good faith, with due consideration for the interests of all of the beneficiaries, and with faithful adherence to the Trust Agreement.

G.   The Bank's Motives In Reaching A Decision To Distribute The Income To Defendant Dwight Are Relevant And Reveal The Decision Was Made To Protect The Bank's Own Interests.

Finally, the Bank asserts that there is no evidence and no set of facts that would permit the Court to find it acted recklessly or in bad faith. Bank's Memo., pp. 10, 13, 14. "Recklessness" is defined as "[n]ot recking, careless, heedless, inattentive, indifferent to consequences. According to circumstances it may mean desperately heedless, wanton or willful, or it may mean only careless, inattentive or negligent." *Black's Law Dictionary* (6th ed. 1990). It includes a refusal to adhere to a clear standard for income distributions in a trust instrument. *See Feibelman v. Worthen National Bank, N.A.,* 20 F.3d 835 (8th Cir. 1994) (upholding jury verdict in favor of remainderman on grounds that facts demonstrated reckless indifference by trustee which failed to establish former standard of living and other income available to the income beneficiary pursuant to a trust which required this analysis). Here, the undisputed facts reveal the Bank recklessly ignored the standard set forth in the Trust Agreement and was reckless in its

- 23 -

investigation of facts and in making promises to Defendant Dwight that she would receive the income of the Trust before any investigation or analysis occurred. Again, the "sole judgment" provision in the Trust Agreement does not excuse the Bank's conduct. *See Restatement (Second) of Trusts* § 222 (1984) ("A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed . . . with reckless indifference to the interest of the beneficiary."). The evidence of the Bank's bad faith is equally compelling.

"Bad faith" includes ". . . a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Black's Law Dictionary* (6th ed. 1990). The Bank's records reveal that in the midst of assuring Plaintiffs it would conduct a proper inquiry and analysis under the Trust Agreement, it was simultaneously assuring Defendant Dwight she would receive the income of the Trust. Ms. Amembal's notes further reveal the Bank's D.A.C. considered Defendant Dwight's "threatened lawsuit" in deciding whether to grant her request and decided "the best course" was to grant the request for "medical expenses" even though "we might have a problem in the future." Plaintiffs' Statement ¶11. These undisputed facts establish that the Bank was motivated by the threat of a lawsuit and a desire to protect its own interests in deciding to grant Defendant Dwight's request. Protection of its own self interests at the expense of its fiduciary duties to Plaintiffs falls squarely within the definition of bad faith. *See Auchincloss v. City Bank Farmers Trust Co.*, 70 A.2d 105, 108 (1949) (discretionary actions of a trustee with "absolute discretion" can be the basis of liability when they are "the result of fraud, bad faith or an abuse of discretion").

- 24 -

In summary, Plaintiffs asked the Bank to undertake the investigation and analysis their father's Trust required in order to determine to whom income distributions should be made. Rather than doing so, the Bank invented its own standard for income distributions and engaged in a *pro forma* and predetermined after-the-fact investigation. The Bank then reached a conclusion that Defendant Dwight's "expenses exceeded her income" which does not satisfy the standard set forth in the Trust Agreement and granted her request upon representations regarding medical expenses which the Bank either knew or should have known were false. Once it was certain that those representations were false, the Bank refused to reconsider its decision despite a fiduciary obligation and an express promise to engage in an "ongoing analysis." Because the evidence of each of these issues is undisputed, Plaintiffs are entitled to summary judgment on each count of their Amended Complaint.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendant JP Morgan Chase Bank's Motion for Summary Judgment and to grant Plaintiffs' Cross-Motion for Summary Judgment.

Dated:       Burlington, Vermont
               December 15, 2003

Robert B. Hemley, Esq.
Christina Reiss, Esq.
Gravel and Shea
P. O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
For Plaintiffs

<204166.1/>

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN K. DWIGHT, MARGO D. FORBES,          :
PATRICIA D. HALLENBECK and                :
ELIZABETH D. RICHARDSON,                  :     CASE NUMBER 303 CV 0177 (WWE)
                                          :
                    Plaintiffs            :
                                          :
                                          :
        v.                                :
                                          :     December 15, 2003
JP MORGAN CHASE BANK, Trustee of          :
the Russell S. Dwight, Jr. Trust, and     :
PATRICIA W. DWIGHT,                       :
                    Defendants            :


CERTIFICATE OF SERVICE

I, Robert B. Hemley, Esq., attorney for Plaintiffs, certify that on December 15, 2003, I

served Plaintiffs' Opposition to Defendant JP Morgan Chase Bank's Motion for Summary

Judgment and Cross-Motion for Summary Judgment; and Plaintiffs' Response to Defendant JP

Morgan Chase Bank's Statement of Undisputed Facts and Plaintiffs' Statement of Undisputed

Facts for Plaintiffs' Cross-Motion for Summary Judgment, by causing the same to be mailed by

United States mail, postage prepaid to the following:

        Robert P. Dolian, Esq.            Mark J. Kovack, Esq.
        Cumming & Lockwood, LLC           Wake, See, Dimes & Bryniczka
        Four Stamford Plaza               27 Imperial Avenue
        107 Elm Street                    P.O. Box 777
        Stamford, CT 06902                Westport, CT 06881-0777

Peter W. Benner, Esq.
Catherine M. Esposito, Esq.
Shipman & Goodwin, LLP
One American Row
Hartford, CT 06103-2819

Dated:        Burlington, Vermont
              December 15, 2003

Robert B. Hemley, Esq. (ct#24489)
Gravel and Shea
76 St. Paul Street, 7th Floor
P. O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
For Plaintiffs

<205720.1/4#qg011.WPD/>

- 2 -