UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

JOHN K. DWIGHT, MARGO D. FORBES,  :
PATRICIA D. HALLENBECK and    :
ELIZABETH D. RICHARDSON,    :

2003 DEC 16  A 10: 25

CASE NUMBER 303 CV 0177 (WWE)

            Plaintiffs    :
                        :
        v.    :
                        :    December 15, 2003
JP MORGAN CHASE BANK, Trustee of    :
the Russell S. Dwight, Jr. Trust, and    :
PATRICIA W. DWIGHT,    :
            Defendants    :

PLAINTIFFS' RESPONSE TO DEFENDANT JP MORGAN
CHASE BANK'S STATEMENT OF UNDISPUTED FACTS
AND PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS FOR
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs, John K. Dwight, Margo D. Forbes, Patricia D. Hallenbeck and Elizabeth D.

Richardson ("Plaintiffs") by and through their attorneys, Gravel and Shea, respond to Defendant

JP Morgan Chase Bank's (the "Bank") Statement of Undisputed Facts (the "Bank's Statement")

as follows:

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted

6.    Admitted.

7.     Admitted in part, disputed in part.  Defendant Dwight advised Defendant Bank that: "I have no current need, nor do I wish any of the income from the Trust until further notice." Exhibit A.  No analysis was therefore conducted and Defendant Dwight never "declined" income to which the Bank had determined she was entitled.  Exhibit B (Amembal Depo., p. 46).

8.     Admitted.

9.     Admitted.

10.     Disputed.  As demonstrated below, the Bank made the determination to suspend distributions to Plaintiffs and to commence distributions to Defendant Dwight on September 10, 2002.  Exhibit C.  At the time, the Bank had no information regarding Ms. Dwight's income and expenses other than the August 29, 2002 letter provided by her attorney, Mr. Musicaro, Exhibit D, quoted in paragraph 9 of the Bank's Statement.  It was only after Plaintiffs raised concerns on September 18, 2002, Exhibit E, about the Bank's decision to give Defendant Dwight the Trust's income that *any* analysis took place.  Exhibit E.  At that point, the Bank was merely attempting to shore up a decision it had already made.  As further demonstrated below, the analysis which the Bank finally performed after the fact of its decision was cursory at best.  *See* paragraphs 21-54 set forth below.

11.     Disputed.  As demonstrated below, Ms. Amembal had already made a decision to distribute all of the Trust's income to Defendant Dwight before presenting any information to the Bank's "discretionary action committee" (the "D.A.C.").  *See also* Exhibit C.  Plaintiffs admit that the D.A.C. convened and considered the matter, but deny that the decision made was based upon "the foregoing information."  The D.A.C.'s analysis was recorded by Ms. Amembal in full

- 2 -

as follows: "Even though some budget items are high, on the whole the expenses are higher than the income." Exhibit F. The reason for the D.A.C.'s decision was recorded by Ms. Amembal as follows:

> "I told the Committee how Patricia Dwight's attorney threatened to sue us
> if she didn't get the income & the natural children of John Dwight also felt
> they deserved the income. Committee said we might have a problem in
> the future, but for now the best course is to give the 86 year old lady
> income for her medical expenses."

Exhibit F. The decision of the D.A.C. made no reference to "income available to Grantor's wife from all sources" or to the "standard of living theretofore maintained by Grantor and his wife."

12.     Disputed. Plaintiffs were advised by letter dated September 10, 2002, prior to any investigation by the Trustee, that the income distributions to them would be suspended because the Bank had "received a request from Patricia Dwight via her attorney, John Musicaro, Jr., to start distributing the net income from the . . . trust to her." Exhibit C.

13.     Admitted that a Complaint was filed; denied that the characterization of "immediately thereafter" is either necessary or accurate. Plaintiffs provided the Bank with in excess of four months after its decision to suspend distributions to them to reconsider the matter before Plaintiffs were forced to file suit. Exhibit C.

### ADDITIONAL UNDISPUTED FACTS MATERIAL TO AN EVALUATION OF THE BANK'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

14.     Russell Dwight and Defendant Dwight were married in 1973. At the time, Defendant Dwight was 58. Exhibit G (Dwight Depo., p. 5). The marriage was a second marriage for each spouse and each of them had grown children from a prior marriage. Exhibit G

- 3 -

(Dwight Depo., pp. 5-6). Russell Dwight was retired during all but the first few years of the marriage. Exhibit G (Dwight Depo., p. 18).

15.     At the time of her marriage to Russell Dwight, Defendant Dwight owned her own home and had in excess of a million dollars of her own money. Exhibit G (Dwight Depo., pp. 7-8). In addition, Russell Dwight was aware that Defendant Dwight was receiving money from her father's trust, the John Wineberg Trust, during the course of their marriage. Exhibit G (Dwight Depo., p. 16). Defendant Dwight spent the money she received from the Wineberg Trust on "presents, gifts and on telephone calls." Exhibit G (Dwight Depo., p. 15).

16.     At the time the Trust was executed in 1982, Russell Dwight and Defendant Dwight reported to the I.R.S. total income in the amount of $106,682.00. Exhibit H. At the time, neither spouse had any wages and the income they reported included dividends of $60,572.00 and capital gains of $24,479.00. Exhibit H.

## DEFENDANT DWIGHT'S REQUEST FOR ALL OF THE TRUST INCOME

17.     When Defendant Dwight requested all of the income from the Trust, she advised the Bank that she would be incurring $200.00 per day or "$72,000 per year for live-in companion and other expenses." Exhibits D, I. Defendant Dwight did not in fact incur this expense and the Bank made no effort to determine whether she had in fact done so. Exhibit G (Dwight Depo., pp. 44, 52); Exhibit B (Amembal Depo., p. 87-88).

18.     Defendant Dwight further advised the Bank that she would be hiring a driver to take her to her appointments. Exhibit D. She did not do so and instead merely continued to hire drivers when needed. Exhibit G (Dwight Depo., p. 40).

- 4 -

19. Defendant Dwight's personal portfolio of stocks and bonds had grown to over $3 million from $1 to $1.5 million when she was married to Russell Dwight. Exhibit G (Dwight Depo., p. 8); Exhibit J. Defendant Dwight has, at all times, had the unrestricted ability to withdraw funds from her personal $3 million account at Prudential, Exhibit G (Dwight Depo., pp. 45-46), and has done so to obtain a more "steady income." Exhibit G (Dwight Depo., pp. 29-30).

20. After receiving Defendant Dwight's August 29, 2002 correspondence requesting all of the income from the Trust, by correspondence dated September 10, 2002, the Bank advised Plaintiffs that it would suspend making any distributions to them. Exhibit C. This communication took place *before* the Bank had reviewed any tax returns, budgets or other financial information from Defendant Dwight. Exhibit K.

21. Ms. Amembal admits that she did not engage in any investigation before suspending payments of the Trust's income to Plaintiffs. Exhibit B (Amembal Depo., p. 92).

22. Ms Amembal's notes and her testimony reveal that as early as September 11, 2002, she was asking Defendant Dwight whether she wanted to receive the income by direct deposit or by check, noting to herself that Defendant Dwight "will send [me] information regarding transfer for first of month (starting in October)." Exhibit B (Amembal Depo., pp. 93-94); Exhibit L.

23. Prior to any review of any financial documents on September 20, 2002, Ms. Amembal made a note to herself to "[s]et-up a monthly tickler for 100% net income [of the

Trust to go to Defendant Dwight] starting 10/1/02." Exhibit M (Exhibit B; Amembal Depo., p. 95).

24.    On September 26, 2002, Ms. Amembal had a telephone conversation with Defendant Dwight in which she "[t]old her that income will go in starting November 1st. Told her I spoke to John Musicaro [Defendant Dwight's attorney] & he said ok." Exhibit N.

PLAINTIFFS RAISE CONCERNS REGARDING
THE BANK'S FULFILLMENT OF ITS FIDUCIARY DUTIES

25.    By correspondence to the Bank dated September 18, 2002, Plaintiffs raised concerns regarding the Bank's decision to suspend all distributions to them and regarding the lack of any analysis of the Trust Agreement's standard for distributing income to Defendant Dwight. Exhibit E.

26.    On October 29, 2002, Plaintiff John Dwight discussed the Trust Agreement with Ms. Amembal and told her that she needed to do a before and after analysis of Defendant Dwight's standard of living. Exhibit O; Exhibit B (Amembal Depo., pp. 105-06).  In other words, she needed to compare the standard of living Defendant Dwight shared with Russell Dwight in 1982 at the time the Trust Agreement was drafted with the standard of living she now enjoyed to determine whether she had sufficient income available to her from all sources to comfortably support herself in her former lifestyle. Exhibit O.

27.    It was only after Plaintiffs raised concerns regarding the Bank's decision to suspend distributions to them without any analysis or investigation that the Bank requested financial information from Defendant Dwight, advising Defendant Dwight that the Bank needed

- 6 -

financial information from her before a distribution could take place. Exhibit P.

Notwithstanding the Bank's purported need for financial information, in this same

communication, the Bank advised Defendant Dwight that the Bank "may have income to give

her starting Dec. 10." Exhibit P.

28.    Prior to any review of any financial documents, Ms. Amembal told Defendant

Dwight's lawyer that Defendant Dwight would get the money when she, Ms. Amembal, got the

financial information but that "it will probably be not October 1, more like November 1."

Exhibit B (Amembal Depo., p. 103). Ms. Amembal  nonetheless denies that she "prejudged" the

matter. Exhibit B (Amembal Depo., p. 101).

29.    The Bank never asked for Defendant Dwight's 1982 expenses or budget items.

Exhibit B (Amembal Depo., p. 108). It also never asked Plaintiffs about the lifestyle their father

and Defendant Dwight enjoyed in 1982. Exhibit B (Amembal Depo., p. 110). The Bank admits

that the income shown on a tax return is "frequently" not a reflection of the taxpayer's standard

of living. Exhibit Q. Boylan Depo., pp. 96-97. The Bank did not determine that the request for

the Trust's income, which was prepared by Defendant Dwight's attorney, was made at or around

the same time Defendant Dwight met with her attorney on estate planning issues, Exhibit K;

Exhibit R (Roberts Depo., pp. 55-56), or that Defendant Dwight was aware the Russell Dwight

Trust assets would go to the Plaintiffs upon her death. Exhibit R (Roberts Depo., p. 57).

30.    By correspondence dated November 1, 2002 sent by her attorney, Defendant

Dwight submitted a budget of her actual and projected expenses and her 2001 tax return.

Exhibit R. Defendant Dwight did not prepare the budget, did not discuss its preparation, and did

- 7 -

not review the budget before it was submitted to the Bank. Exhibit G (Dwight Depo. p. 37). When asked in deposition if the budget items were accurate, Defendant Dwight testified that "some things I guess are and some aren't." Exhibit G (Dwight Depo., pp. 37-38). She acknowledged that she did not ask that it be prepared or direct anyone to submit it on her behalf. Exhibit G (Dwight Depo. p. 38).

<u>THE D.A.C.'S ANALYSIS OF DEFENDANT DWIGHT'S BUDGET</u>

31.    The Bank's D.A.C. met by telephone on November 22, 2002. They considered only three items of information beyond the Trust Agreement itself: Defendant Dwight's August 29, 2001 correspondence, her actual and projected budget, and her 2001 tax return. Exhibit B (Amembal Depo., pp. 55-58).

32.    The Bank made no inquiry into the following increases in expenses from 2001 to 2003 shown on Defendant Dwight's budget and did nothing to verify their accuracy:

| | |
|---|---|
| **Insurance:** | $2,640.00 to $13,000.00 |
| **Income taxes from:** | $5,346.00 (2002) to $75,000.00 |
| **Clothes, Cleaners, Dressmaker:** | $323.00 to $4,000.00 |
| **Hunt Club:** | $3,550.00 to $4,000.00 |
| **Home Improvements:** | $0 to $6,000.00 |
| **Professional Fees:** | $1,675.00 to $5,400.00 |
| **Professional Subscriptions:** | $1,400.00 to $1,400.00 |
| **Subscriptions, Dues, etc.:** | $258.00 to $1,500.00 |
| **Visa:** | $12,000.00 to $20,000.00 |
| **Gifts:** | $48,000.00 to $65,000.00 |

Exhibit K; Exhibit Q (Boylan Depo., pp. 21, 85-88, 93).

33.    Defendant Dwight's medical expenses, as shown on her budget, were projected to increase by only approximately $2,000.00 from 2001 to 2003. Exhibit K.

- 8 -

34.    Jeffrey Boylan, the Bank's manager of its Manhattan office for personal asset management and trust assets, testified that it was "reasonable to consider whether budget items could be reduced" but does not recall the D.A.C. making such an inquiry. Exhibit Q (Boylan Depo., pp. 90, 93).

35.    Ms. Amembal testified that the D.A.C. excluded Defendant Dwight's income taxes and gifts in analyzing her budget but added back in $21,000.00 in income taxes. Exhibit B (Amembal Depo., p. 79). If these items are excluded from Defendant Dwight's budget, she had experienced only a $7,000.00 increase in expenses, but was nevertheless given all of the Trust income (approximately $40,000.00). Exhibit K. In contrast, Mr. Boylan testified that the inclusion of gifts in Defendant Dwight's budget was acceptable although he agreed that the increase in Defendant Dwight's income taxes did not reflect an increase in need. Exhibit Q (Boylan Depo., p. 86).

THE D.A.C.'S ANALYSIS OF
DEFENDANT DWIGHT'S INCOME AVAILABLE FROM ALL SOURCES

36.    The D.A.C.'s analysis of "income available to Defendant Dwight from all sources" consisted only of looking at Defendant Dwight's 2001 tax return. Exhibit B (Amembal Depo., pp. 24-25). According to Ms. Amembal, the D.A.C. decided not to consider the capital gains declared on the 2001 tax return "[b]ecause we considered that as capital or assets rather than just solely income." Exhibit B (Amembal Depo., pp. 25-26, 38).[1] Ms. Amembal

---

[1] In deposition, Mr. Boylan initially did not exclude Defendant Dwight's capital gains in determining Defendant Dwight's 2002 income but changed his testimony on this point after taking a break from his deposition to consult with the Bank's counsel. Exhibit Q (Boylan Depo., pp. 45-46). Mr. Boylan, however, conceded that capital gains are included in taxable income and that the Bank follows

- 9 -

nonetheless agrees that capital gains are part of a taxpayer's adjusted gross income. Exhibit B (Amembal Depo., pp. 28-29). In contrast, Mr. Boylan, also a member of the D.A.C., testified that there was no discussion of the capital gains treatment at the D.A.C.'s telephonic meeting to consider Defendant Dwight's request. Exhibit Q (Boylan Depo., p. 48).

37.    The Bank acknowledges that Defendant Dwight's 2001 tax return only shows taxable distributions and income actually received. Exhibit B (Amembal Depo., pp. 33, 35-36). The Bank agrees, however, that "the question . . . asked by the trust is not what did you actually take but what is the amount of income available to you." Exhibit B (Amembal Depo., p. 33).

38.    At the time of Defendant Dwight's request for all of the income of the Trust, her 2001 tax return revealed total income of $106,173.00. Exhibit K.

39.    The Bank asked Defendant Dwight about other sources of income only because Plaintiff John Dwight told the Bank it should do so. Exhibit B (Amembal Depo., p. 30).

40.    In response to the Bank's request for information regarding the existence of other income, Defendant Dwight disclosed the existence of the Wineberg Trust which had assets in excess of $1.8 million as of December 31, 2000. Exhibit B (Amembal Depo., pp. 30-31); Exhibit S. The Bank did not ask whether Defendant Dwight was taking all of the income to which she was entitled under the Wineberg Trust, did not examine the Wineberg Trust document, and did not examine any account statements for the Wineberg Trust. Exhibit B (Amembal Depo., pp. 31-32, 34, 37); Exhibit Q (Boylan Depo., pp. 102-03).

---

the I.R.S.'s definition of taxable income. Exhibit Q (Boylan Depo., pp. 46-47).

41.    At the time of her request for all of the income of the Trust, Defendant Dwight had assets in a Prudential Securities account in excess of $3,000,000.00. Exhibit J; Exhibit G (Dwight Depo., p. 8). The Bank did not consider the Prudential account in its analysis and did not ask any questions regarding whether the money was invested in the account in a manner which would produce a reasonable amount of income. Exhibit B (Amembal Depo., pp. 38-40); Exhibit Q (Boylan Depo., pp. 101-02).

42.    The Bank relies upon on the statements of the drafter of the Trust, Attorney See, that only Defendant Dwight's income need be examined in analyzing distributions under the Trust Agreement and for the proposition that Defendant Dwight was "number one" and the "primary beneficiary" to be protected by the Trust. Bank's Statement, ¶10. The Bank does not disclose that Attorney See is currently a member of the firm representing the Bank. Exhibit B (Amembal Depo., pp. 17-18). Moreover, with regard to other trusts which it administers, the Bank concedes that under the Connecticut Principal and Income Act, "if there is an instrument where the beneficiary can only receive income and no principal, we can still look at the entire account and give them a percentage of the market value of the account." Exhibit B (Amembal Depo., p. 10). It did not apply this standard to Defendant Dwight's own accounts. Exhibit B (Amembal Depo., pp. 38-40).

### THE BANK'S UNDERSTANDING OF ITS FIDUCIARY DUTIES UNDER THE TRUST AGREEMENT

43.    Ms. Amembal has testified that in order to determine Defendant Dwight's entitlement to income from the trust, you need to determine whether her income from all sources

- 11 -

exceeds that which is necessary to maintain her 1982 income. Exhibit B (Amembal Depo., p. 46). She has also testified, however, that this analysis is required only for the "excess income to be distributed to the children of Russell Dwight . . . [a]fter you pay the initial income to her." Exhibit B (Amembal Depo, pp. 44-45).

44.     Mr. Boylan testified that he interprets the Trust Agreement as requiring the Bank to exercise its discretion only if it is distributing income to someone other than Defendant Dwight. Exhibit Q (Boylan Depo., pp. 61, 119). He does not agree that "once it has been determined that the income available to Mrs. Dwight from all sources exceeds that which is necessary for her support at the standard of living maintained with Russell Dwight, it is mandated to give [the] income to the Dwight children." Exhibit Q (Boylan Depo., p. 61).

45.     The Bank has described its approach to the analysis required by the Trust as follows: "absent any other circumstance, Pat Dwight got the money," that Defendant Dwight "saying I want [the income] was enough," that "it was enough just to ask for it," and that "the instrument directs that [Defendant Dwight] gets to be paid the net income." Exhibit B (Amembal Depo., pp. 23, 44, 117-18); Exhibit Q (Boylan Depo., pp. 59-60).

## THE D.A.C.'S DECISION TO DISTRIBUTE
## ALL OF THE INCOME OF THE TRUST TO DEFENDANT DWIGHT

46.     The D.A.C.'s analysis was recorded by Ms. Amembal in full as follows: "Even though some budget items are high, on the whole the expenses are higher than the income." Exhibit F. The D.A.C. thus determined that Defendant Dwight's budget revealed total expenses

which exceeded the income on her 2001 tax return: "that was the analysis." Exhibit B (Amembal

Depo., pp. 60-61).

47.   The reason for the D.A.C.'s decision was recorded by Ms. Amembal as follows:

> "I told the Committee how Patricia Dwight's attorney threatened to sue us
> if she didn't get the income & the natural children of John Dwight also felt
> they deserved the income. Committee said we might have a problem in
> the future, but for now the best course is to give the 86 year old lady
> income for her medical expenses."

Exhibit F.

48.   The D.A.C. advised Plaintiffs that its decision to give Defendant Dwight the

income from the Trust was "because of the increase in her medical expenses." Exhibit B

(Amembal Depo., p. 53); Exhibit T. The Bank concedes that Defendant Dwight's medical

expenses were projected to increase by only approximately $2,000.00 from 2001 to 2003.

Exhibit B (Amembal Depo., pp. 67-70).

## THE BANK'S FIDUCIARY OBLIGATION
## TO ENGAGE IN A CONTINUING ANALYSIS

49.   The Bank acknowledges that it has a fiduciary duty to the Dwight children as well

as to Defendant Dwight. Exhibit Q (Boylan Depo., p. 66).

50.   The Bank further acknowledges that it has an obligation to make a continuing

evaluation of how the Trust's income should be distributed. Exhibit Q (Boylan Depo., pp. 47-

48).

- 13 -

51.    By correspondence dated December 6, 2002, the Bank informed Plaintiffs of the D.A.C.'s decision that "all net income should now be distributed to Patricia Dwight for her medical expenses." The Bank stated that it "will be reviewing her income and expenses on an on-going basis and will inform you immediately if there is any excess income available for you and your three sisters." Exhibit T.

52.    The Bank agrees that if Defendant Dwight did not hire a live-in companion as represented, that would affect its decision. Exhibit B (Amembal Depo., p. 138). The Bank has known at least since June 24, 2003, the date of Defendant Dwight's deposition, that this alleged expense was not actually incurred. Exhibit G (Dwight Depo., pp. 44, 52). Nor have her expenses for drivers or other helpers increased by the amounts projected. Her drivers are paid $15.00 to 25.00 per hour and come only when needed. Exhibit G (Dwight Depo., pp. 40-41). Her use of cleaning persons is as it was previously. Exhibit G (Dwight Depo., p. 52).

53.    After the Bank announced its decision to distribute all of the Trust's income to Defendant Dwight, she filed a 2002 tax return revealing $476,809.00 in income. Exhibit U; Exhibit B (Amembal Depo., pp. 54-55). Defendant Dwight's 2002 tax return does not indicate the represented $72,000.00 increase in medical expenses. Exhibit B (Amembal Depo., p. 140).

- 14 -

54.     Despite Plaintiffs' requests and the Bank's promise to do so, the Bank has engaged in no subsequent reviews of its decision to give Defendant Dwight all of the Trust income.  Exhibit B (Amembal Depo., p. 131); Exhibit V.

55.     A true copy of the Trust Agreement is Attached hereto as Exhibit W.

Dated:          Burlington, Vermont
                December 15, 2003

                                        _____
                                        Robert B. Hemley, Esq.
                                        Christina Reiss, Esq.
                                        Gravel and Shea
                                        76 St. Paul Street, 7th Floor
                                        P. O. Box 369
                                        Burlington, VT  05402-0369
                                        (802) 658-0220
                                        For Plaintiffs